**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES F. SMALL, Regional Director
of Region 21 of the National
Labor Relations Board for and on
behalf of the National Labor
Relations Board,
      *Petitioner-Appellee,*

v.

AVANTI HEALTH SYSTEMS, LLC;
CHHP HOLDINGS II, LLC; CHHP
MANAGEMENT, LLC,
      *Respondents-Appellants.*

No. 11-55563

D.C. No.
2:11-cv-01349-
ODW-FMO

OPINION

Appeal from the United States District Court
for the Central District of California
Otis D. Wright, District Judge, Presiding

Argued and Submitted
August 4, 2011—Pasadena, California

Filed October 31, 2011

Before: Stephen Reinhardt, Kim McLane Wardlaw, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Reinhardt

19737

## COUNSEL

Richard W. Kopenhefer and Valerie E. Alter, Sheppard Mullin Richter & Hampton LLP, Los Angeles, California, for the respondents-appellants.

Lafe E. Solomon, Acting General Counsel, Judith I. Katz, Assistant General Counsel, Celeste J. Mattina, Acting Deputy General Counsel, Steven L. Sokolow, Deputy Assistant General Counsel, Barry J. Kearney, Associate General Counsel, and Richard J. Lussier, Senior Attorney, National Labor Relations Board, Washington, D.C., for the petitioner-appellee.

## OPINION

REINHARDT, Circuit Judge:

### I.

In March 2010, Karykeion Inc. sold Community Hospital to CHHP.[1] Three days after the sale became final, CHHP took over ownership of Community. CHHP refused, however, to recognize or bargain with the California Nurses Association, the union that had represented the registered nurses at Community under Karykeion's ownership. James Small, Regional Director of Region 21 of the National Labor Relations Board (the "Director"), sought preliminary injunctive relief in the district court pursuant to § 10(j) of the National Labor Relations Act (NLRA). The Director alleged that CHHP was a successor employer to Karykeion and that a majority of CHHP's registered nurses had been members of the California Nurses Association under Karykeion. The Director therefore alleged that CHHP's continuing failure to bargain in good

---

[1] We refer to the defendants, Avanti Health Systems, LLC, CHHP Holdings II, LLC, and CHHP Management, LLC, collectively as CHHP.

faith with the chosen representative of its employees violated §§ 8 (a)(1) & 8 (a)(5) of the NLRA.

The district court granted the Director's § 10(j) petition and issued a preliminary injunction. It applied the test established by the Supreme Court in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), and held that the Director had established a likelihood of success on the merits and a likelihood of irreparable harm, that the balance of equities tipped in the Director's favor, and that the public interest favored the issuance of the injunction. *See id.* at 20. We conclude that the district court did not abuse its discretion in issuing the preliminary injunction and therefore affirm its order.

## II.

## A.

Community Hospital of Huntington Park ("Community") is an acute-care hospital located in Huntington Park, California. Until March 2010, Community was owned by Karykeion, Inc. From 2004 to the end of Karykeion's ownership, registered nurses ("RNs") at Community were represented by the California Nurses Association ("CNA" or "union"). The most recent collective bargaining agreement ("CBA") between Karykeion and the CNA was to be effective from January 1, 2007 to June 30, 2010. In September 2008, Karykeion filed for bankruptcy protection, and attempted to sell Community. CHHP[2] sought to buy Community from Karykeion, but required Karykeion to reject the CBA with the CNA before any sale was completed. CHHP also required Karykeion to reject its CBA with the Service Employees International Union ("SEIU"), which represented janitorial employees at Community.

---

[2]Avanti Health Systems, LLC formed CHHP Holdings II, LLC to purchase Community Hospital and CHHP Management to manage the hospital.

On March 6, 2010, while CHHP was negotiating with Karykeion over the sale of Community, Dinorah Williams, a labor representative from the CNA, sent a letter to CHHP. The letter asserted that CHHP would be a successor employer to Karykeion and would thus be required to recognize and bargain with the CNA. Williams later declared that the union had been told by Daniel Ansel, Karykeion's CFO and Chief Restructuring Officer, that "Avanti didn't want the Union no matter what" and that "Avanti would do whatever was necessary to make[ ] sure they didn't have the Union." Ansel told Williams that CHHP "would only agree to buy the hospital if there wasn't a union."

On March 15, 2010, the bankruptcy court granted Karykeion's motion to reject the CBA between Karykeion and the CNA. The hospital's assets were put up for sale at a public auction and CHHP purchased Community on March 23rd. CHHP was not required to assume the CBA. On March 26th, CHHP officially took control of Community. Araceli Lonergan, Community's CEO, declared that "[t]he new staff . . . began working effective Friday, March 26, 2010, three days after the sale was finalized." Steven Lopez, Avanti's CFO agreed, and averred that he believed that Community was "fully staffed" on that date.[3] Although CHHP did reduce Community's staffing levels, Lopez declared that CHHP "didn't make any major operational changes" when it took over Community, and Community continued "to provide the same health care services."

On March 26th, Lopez met with Richard Kopenhefer, CHHP's labor counsel, and together they undertook efforts to determine whether CHHP was a successor employer to Karykeion and thus obligated to bargain with the CNA. They concluded that the CNA did not represent a majority of its RNs and refused to recognize the CNA or to bargain with it.

---

[3]Lopez also declared, however, that he believed that CHHP's workforce was not "stabilized" until mid-May, 2010.

The Director disputes CHHP's calculations. On Karyk-eion's March 25th "Employee Register," every RN is marked with a "union code designation," indicating membership in the CNA. The Director compared this Employee Register to CHHP's payroll for the period from March 26th to April 4th, which shows that CHHP employed a total of 47 RNs. After comparing Karykeion's Register to CHHP's payroll, the Director identified 30 CHHP RNs who were part of the CNA bargaining unit at Karykeion. The Director thus calculated the union incumbency rate as 63.8% (30/47).

## B.

On December 1, 2010, the CNA filed a charge with the National Labor Relations Board (the "Board" or the "NLRB") against CHHP alleging violations of §§ 8(a)(1), (3) and (5) of the NLRA. 29 U.S.C. § 158(a)(1), (3) and (5). On December 27, the Acting General Counsel of the NLRB filed a complaint against CHHP alleging violations of §§ 8(a)(1) and (5) of the NLRA. Section 8(a)(1) makes it unlawful for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights [to join labor unions and bargain collectively]." *Scott ex rel. NLRB v. Stephen Dunn & Assocs.*, 241 F.3d 652, 662 (9th Cir. 2001) (quoting 29 U.S.C. § 158(a)(1) (brackets in original)), *abrogated on other grounds as recognized by McDermott v. Ampersand Pub., LLC*, 593 F.3d 950, 957 (9th Cir. 2010). Section 8(a)(5) makes it unlawful for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a).

On February 14, 2011, the Director, on behalf of the NLRB, petitioned the district court for a preliminary injunction against CHHP pursuant to § 10(j).[4] The Director alleged

---

[4]Section 10(j) of the NLRA provides that "[t]he Board shall have power, upon issuance of a complaint . . . charging that any person has engaged in or is engaging in an unfair labor practice, to petition any

in his petition that CHHP had violated and was continuing to violate §§ 8(a)(1) and (5) of the NLRA by refusing to recognize and bargain with the CNA despite CHHP's status as a successor employer to Karykeion. On March 28, 2011, the district court applied the preliminary injunction standard set forth in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), and determined that an injunction was warranted. The district court ordered CHHP to cease and desist from "[f]ailing and refusing to recognize and bargain collectively and in good faith with the California Nurses Association . . . as the exclusive bargaining representative" of CHHP's RNs. The district court also ordered CHHP to affirmatively recognize and bargain in good faith with the CNA and "if an understanding is reached, embody that understanding in a signed agreement."

CHHP timely appealed the district court's order. CHHP also moved for an emergency stay pending appeal, but a motions panel of our court denied the stay. 9th Cir. Dkt. 9, 16.

On June 14, 2011, an NRLB Administrative Law Judge ("ALJ") issued a decision based on four days of hearings held in mid-March. 9th Cir. Dkt. 35 (hereinafter "ALJ Decision") at 1-2.[5] Like the district court, the ALJ concluded that on March 26, 2010, Community employed 47 RNs. *Id*. at 5-6. Of these 47 RNs, the ALJ found that 30 were in the CNA bargaining unit at Karykeion, and thus that a majority of RNs in the unit were union incumbents. Therefore, the ALJ determined that CHHP was obligated to recognize the CNA and

United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred . . . for appropriate temporary relief or restraining order. Upon the filing of any such petition the court . . . shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper." 29 U.S.C. § 160(j).

[5]This decision is found in the 28(j) letter filed by the Director on July 15, 2011. 9th Cir. Dkt. 35.

bargain with it in good faith. *Id*. at 5, 10. The ALJ ordered nearly identical relief to that ordered by the district court.[6]

The ALJ's decision is not part of the record below because it was issued after the district court's opinion; however, we may take judicial notice of it pursuant to Federal Rule of Evidence 201. *See Overstreet v. United Bhd. of Carpenters and Joiners of Am., Local Union No. 1506*, 409 F.3d 1199, 1204 (9th Cir. 2005). We do so here. CHHP does not argue that we should not. Although it is beyond dispute that the ALJ's ruling does not "foreordain[ ] the Board's decision," *id.* at n.12, three other circuits have looked to ALJ decisions in reviewing the grant or denial of § 10(j) petitions. In *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 288 (7th Cir. 2001), the Seventh Circuit relied on an ALJ opinion when reviewing a district court's refusal to grant a § 10(j) injunction, even though the ALJ decision was not issued until two months after the district court's order. It did so because:

> [a]ssessing the Director's likelihood of success calls for a predictive judgment about what the Board is likely to do with the case. The ALJ is the Board's first-level decisionmaker. Having presided over the merits hearing, the ALJ's factual and legal determinations supply a useful benchmark against which the Director's prospects of success may be weighed.

*Id.*[7]

We find the Seventh Circuit's rationale compelling, but in this case, we need not decide how much weight to give to the ALJ's decision. As discussed below, the Director has demon-

---

[6]CHHP filed exceptions to the ALJ's decision.

[7]The First and Second Circuits have also looked to ALJ's decisions, even though they were issued after the district court's decision. *Rivera-Vega v. ConAgra, Inc.*, 70 F.3d 153, 157 n.7, 161 (1st Cir. 1995); *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 37 n.7 (2d Cir. 1975).

strated a likelihood of success even in the absence of the ALJ's determination. Therefore, we need not rely on the ALJ's decision, although we note that if we did rely on it, the ALJ's ruling would provide additional support for our decision.

## III.

We review the grant of an injunction pursuant to § 10(j) of the NLRA for an abuse of discretion. *See Small ex rel. NLRB v. Operative Plasterers' & Cement Masons' Int'l Assoc.*, 611 F.3d 483, 489 (9th Cir. 2010). "The district court abuses its discretion if it relies on a clearly erroneous finding of fact or an erroneous legal standard." *Id.* We review de novo whether the district court applied the correct legal standards. *Id.*

## IV.

**[1]** Section 10(j) authorizes the district court to grant "such temporary relief or restraining order as it deems just and proper." 29 U.S.C. § 160(j). In conducting that determination, "district courts consider the traditional equitable criteria used in deciding whether to grant a preliminary injunction." *McDermott*, 593 F.3d at 957. While employing the traditional equitable criteria, district courts must "keep[ ] in mind that the underlying purpose of § 10(j) is 'to protect the integrity of the collective bargaining process and to preserve the [NLRB's] remedial power while it processes the charge.' " *Id.* (quoting *Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 459-60 (9th Cir. 1994) (en banc)).

The test for a preliminary injunction, laid out by the Supreme Court in *Winter,* is as follows:

> A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance

of equities tips in his favor, and [4] that an injunction is in the public interest.

555 U.S. at 20.

*Winter* overturned this court's precedents that allowed district courts to grant injunctions when a plaintiff demonstrated a strong likelihood of prevailing on the merits, but only a possibility of irreparable harm. *Id.* at 22 (holding that "the Ninth Circuit's 'possibility' standard is too lenient"). However, *Winter* did not change the requisite showing for any individual factor other than irreparable harm. *See Frankl v. HTH Corp.*, No. 10-15984, ___ F.3d ___, 2011 WL 3250637, at *15 (9th Cir. July 13, 2011); *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011).

## A.　Likelihood of Success on the Merits

**[2]** We recently reaffirmed that "the regional director in a § 10(j) proceeding 'can make a threshold showing of likelihood of success by producing some evidence to support the unfair labor practice charge, together with an arguable legal theory.' " *Frankl*, 2011 WL 3250637, at *16 (quoting *Miller*, 19 F.3d at 460).

Moreover, when the Director seeks and receives approval from the NLRB before filing a § 10(j) petition, the Director is owed special deference because "likelihood of success is a function of the probability that the Board will issue an order determining that the unfair labor practices alleged by the Regional Director occurred." *Frankl*, 2011 WL 3250637, at *16. That the NLRB "itself decid[ed] to file a Section 10(j) petition might signal its future decision on the merits, assuming the facts alleged in the petition withstand examination at trial." *McDermott*, 594 F.3d at 964. The NLRB files for § 10(j) injunctions relatively rarely.[8]

---

[8]*See* Memorandum from Lafe E. Solomon, Acting Director General Counsel, NLRB, to All Employees at 2, 8 (Jan. 10, 2011), *available at*

**[3]** To evaluate the Director's likelihood of success, we apply the standard set forth by the Supreme Court in *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27 (1987). In that case, the Court held that a successor employer has an obligation to bargain with a union if "the new employer is in fact a successor of the old employer and the majority of its employees were employed by its predecessor." *Id.* at 43. The parties agree that CHHP is a successor employer of Karykeion because of the "substantial continuity" in the operations of Community under both employers. *See id.* at 43. Therefore, here, the Director's likelihood of success turns on whether a majority of the RNs at CHHP were in the RN bargaining unit at Karykeion.

To determine whether union incumbents comprised a majority of CHHP's RNs, we must decide (1) on what day CHHP employed a "substantial and representative" complement of the employees in the relevant bargaining unit, and (2) whether, on that date, a majority of CHHP's RNs were former members of Karykeion's CNA bargaining unit. Especially in light of the deference due to the Director, the district court did not clearly err in determining that the Director was likely to succeed on the merits because CHHP employed a substantial and representative complement of RNs on March 26th and a majority of CHHP's RNs on that date were union incumbents.

**1.**

**[4]** As discussed above, in evaluating likelihood of success on the merits, we must first determine the date on which CHHP employed a "substantial and representative comple-

http://mynlrb.nlrb.gov/link/document.aspx/09031d4580434379 (noting 23 filings in 2009). From 1996 to 2009, the number of § 10(j) petitions filed ranged from a low of 10 in 2004 to a high of 45 in 2000. Catherine L. Fisk & Deborah C. Malamud, *The NLRB in Administrative Exile: Problems with its Structure and Function and Suggestions for Reform*, 58 Duke L.J. 2013, 2030 tbl. 1 (2009).

ment" of RNs. In determining when a "substantial and representative complement" of employees has been hired, primary considerations are " 'whether the job classifications designated for the operation were filled or substantially filled and whether the operation was in normal or substantially normal production.' " *Fall River*, 482 U.S. at 48 (quoting *Premium Foods, Inc. v. NLRB*, 709 F.2d 623, 628 (9th Cir. 1983)). Also pertinent are " 'the size of the complement on that date and the time expected to elapse before a substantially larger complement would be at work . . . as well as the relative certainty of the employer's expected expansion.' " *Id*. (quoting *Premium Foods*, 709 F.2d at 628).

In *Fall River*, the Court concluded that the successor employer had hired a substantial and representative complement of employees when it " 'had hired employees in virtually all job classifications, had hired at least fifty percent of those it would ultimately employ in the majority of those classifications, and employed a majority of the employees it would eventually employ when it reached full complement.' " *Fall River*, 482 U.S. at 52 (quoting *N.L.R.B. v. Fall River Dyeing & Finishing Corp.*, 775 F.2d 425, 431-32 (1st Cir. 1985)).[9] Moreover, the employer had begun normal operations, and even though it intended to expand from one shift of workers to two shifts, "that expansion was contingent expressly upon the growth of the business." *Id.*

**[5]** Here, the district court concluded that on March 26, 2010, CHHP employed a substantial and representative complement of RNs. The ALJ also found that CHHP employed a substantial and representative complement of RNs on that

---

[9]Here, as discussed above, the CNA bargaining unit is only RNs. In *Fall River*, all production and maintenance employees were in the bargaining unit. *See Fall River*, 482 U.S. at 33. The parties do not discuss employment levels in any of the other job classifications at Community, but the hospital did open for normal or substantially normal operations on March 26th. In any event, in reviewing a § 10(j) injunction, the proper focus of our review is the bargaining unit at issue.

date. ALJ Decision at 10. We agree. On that date, the RN positions were substantially filled because CHHP employed a majority of the RNs it eventually planned to employ, the operation was in "normal or substantially normal production" and there was no "relative certainty" that the employer would hire a substantially larger complement of employees.

According to CHHP's own payroll records, between March 26th and April 4th it employed 47 RNs. Lopez, the CFO of Community, declared in both an NLRB affidavit and a sworn declaration that CHHP's employees "began working effective Friday, March 26, 2010," and he believed "as of March 26th that Community Hospital was fully staffed."[10]

[6] CHHP asserts, however, that its workforce was not stabilized until mid-May because some of its RNs failed to show up for work on the first day or resigned soon after. The fact that some RNs did not show up for work during the first week of CHHP's ownership does not mean that CHHP had not yet hired a substantial and representative complement of RNs. At most, it means that CHHP planned to hire the 62 RNs to whom it had made offers.[11] But, 47 RNs worked during the

---

[10]CHHP alleges that it "defies rationality" to believe that it could staff Community with 47 RNs in part because state law dictates how many RNs it is required to hire. Of course CHHP does not dispute the accuracy of its own payroll records, so it is clear that CHHP *did* staff Community with only 47 RNs during the first pay period. Although CHHP was required to maintain a certain nurse-to-patient ratio, this does not mean that CHHP was required to employ more than 47 registered nurses. *See* Cal. Code Regs. tit. 22 § 70217 (2008). The legal ratio depends on the number of patients as well as the number of "licensed nurses," which includes not only registered nurses, but also licensed vocational nurses and licensed psychiatric technicians. *Id.* CHHP does not explicitly assert that 47 RNs would fall below the legal limit for RNs at Community. There is no dispute that CHHP opened the hospital with only 47 RNs on March 26th, and we cannot presume that CHHP was operating illegally when it did so.

[11]CHHP initially asserted that this list contained 65 RNs; however, the March 26th list of offers and acceptances contains the names of only 62 RNs. CHHP does not deny that it made offers to only 62 RNs.

first pay period, and 47 is 76% of 62. *Fall River* held that a *majority* of employees constitutes a substantial and representative complement, as long as the operation was running substantially normally, which was the case here. CHHP does not argue that it planned to dramatically expand beyond 62 RNs; in fact, it argues that it had "finished hiring" on May 16th, when it employed only 61 RNs.[12] CHHP appears to ask us to adopt the "full complement" test, which would calculate union incumbency only once the successor employer had hired *all* of the employees eventually to be employed. The Supreme Court, however, explicitly rejected this test in *Fall River*. 482 U.S. at 50 ("[P]etitioner's 'full complement' proposal must fail."). Therefore, the proper date for determining union incumbency is not May 16th, when CHHP was done hiring, but rather March 26th, when it had hired a majority of RNs. Accordingly, the district court did not clearly err in determining that CHHP employed a "substantial and representative complement" of the relevant bargaining unit on March 26, 2010.

**2.**

[7] Having determined that March 26, 2010 was the correct date for the employee count, the next question is whether union incumbents comprised a majority of the bargaining unit. The district court and the ALJ both agreed with the Director that there were 47 RNs in the bargaining unit on that date. CHHP does not provide any compelling evidence to the contrary, and therefore we defer to the Director's calculations.

[8] In coming to its conclusion, the district court and the Director relied on CHHP's Community payroll from March 26th to April 4th. This payroll, Community's first after it

---

[12]In its opening brief, CHHP argued that it employed 68 RNs in mid-May, but in counting 68, CHHP included four nursing supervisors, an "RN Case Manager," a "Manager ICU/UMS," and a "Peds/Surgery Manager." CHHP does not deny that inclusion of these employees was erroneous.

commenced operations under CHHP ownership, lists 47 employees with the title "registered nurse." The district court did not err in relying on that payroll. CHHP argues that we should instead count 62 members of the bargaining unit because CHHP had made offers and received acceptances from 62 RNs. But, some of the employees who received offers never reported to work, and others did not commence working until subsequent pay periods.[13] Moreover, CHHP's argument that it employed 62 RNs on March 26th directly contradicts its assertion that it had not employed a "substantial and representative complement" of RNs until mid-May (at which time it employed 61 RNs).

The purpose of the "substantial and representative complement" rule is to protect the interests of employees. *See Fall River*, 482 U.S. at 48 (noting that the rule balances the interest in maximizing employee participation against the interest in allowing employees to be represented as quickly as possible). Only those employees who actually worked for CHHP should be counted; otherwise, employers would have an incentive to inflate the number of employees in the bargaining unit through sham offers and acceptances. Any system for counting employees will have line-drawing problems, but it is clear that the Director has some evidence to support his contention as well as an arguable legal theory. "A conflict in the evidence does not preclude the Regional Director from making the requisite showing for a section 10(j) injunction." *Dunn*, 241 F.3d at 662. It was not clear error for the district court to use 47 as a base number for its count.

---

[13]Ten of the 18 RNs that CHHP had offered jobs to as of March 26 but who did not appear for work during the first pay period *do* appear on subsequent payroll records. Eight RNs, however, apparently never showed up for work. Even if we counted the ten RNs who later worked for Community, incumbents would comprise 58% (33/57) of the bargaining unit.

**3.**

**[9]** After determining that the bargaining unit contained 47 RNs, we must determine whether the Director presented some evidence that at least 24 of the 47 RNs were previously in the bargaining unit under Karykeion's ownership; if so, CHHP was required to recognize and bargain with the CNA. *Fall River*, 482 U.S. at 47 ("If, at this particular moment, a majority of the successor's employees had been employed by its predecessor, then the successor has an obligation to bargain with the union that represented these employees."). We conclude that the Director has presented far more than some evidence that 30 of the 47 RNs employed by CHHP on March 26th were Karykeion bargaining unit incumbents.

The Director identified 30 incumbents in the bargaining unit by comparing CHHP's list of RNs to the RNs who were designated as CNA members on Karykeion's March 25th "Employee Register." Karykeion's Chief Nursing Officer confirmed that those RNs were part of the CNA bargaining unit at Community.

**[10]** Therefore, the district court did not clearly err in finding that union incumbents comprised a majority of the bargaining unit.[14] All the Director needs to do is present some evidence and an arguable legal theory: he has far surpassed that low threshold here.[15] Accordingly, the district court did

---

[14]We note that although CHHP did not mark incumbents on the March 26th payroll, it did mark incumbents on the March 26th offers and acceptance list and the May 16th payroll. Even by CHHP's count, 28 members of the 47-member bargaining unit, a majority, were union incumbents.

[15]CHHP also asserts that if it were permitted to submit the evidence presented to the ALJ, it "could prove definitively that the Union did not represent a majority of incumbent nurses." However, the ALJ ruled against CHHP and came to the same numerical conclusions as the Director and the district court. ALJ Decision at 11.

not abuse its discretion in concluding that the Director was likely to succeed on the merits.[16]

## B.   Likelihood of Irreparable Harm

### 1.

**[11]** After *Winter*, a district court cannot grant an injunction unless the Director has shown that irreparable harm is "likely"; the "possibility" of harm is insufficient to meet the Director's burden. 555 U.S. at 22. Of course, while "likely" is a higher threshold than "possible," the Director need not prove that irreparable harm is certain or even nearly certain. Moreover, as we recently reaffirmed, "permit[ting an] alleged unfair labor practice to reach fruition and thereby render[ing] meaningless the Board's remedial authority *is* irreparable harm." *Frankl*, 2011 WL 3250637, at *22 (emphasis added).

**[12]** The district court did not abuse its discretion in determining that the Director had shown a likelihood of irreparable harm. Given the likelihood of success established above, CHHP's refusal to bargain in good faith is likely to cause irreparable harm absent an injunction. "[F]ailure to bargain in good faith[ ] has long been understood as likely causing an irreparable injury to union representation." *Frankl*, 2011 WL 3250637, at *23.

**[13]** Given the central importance of collective bargaining to the cause of industrial peace, when the Director establishes a likelihood of success on a failure to bargain in good faith

---

[16]Although the foregoing analysis has established that the district court did not clearly err in calculating the size of the bargaining unit, we also note that the Director has presented some evidence that union incumbents comprised a majority of the bargaining unit even if we accepted CHHP's arguments that the unit should include the 62 RNs to whom offers were made as of March 26th or the 61 RNs on the May 16th payroll. *See supra* note 13.

claim, that failure to bargain will likely cause a myriad of irreparable harms.

First, a failure to bargain eliminates the possibility that the union and employer will negotiate a collective bargaining agreement as long as that failure continues. Therefore, without bargaining, employees are denied the opportunity to achieve the economic benefits that a CBA can secure for workers. This harm is likely to be irreparable because "the Board generally does not order retroactive relief, such as back pay or damages, to rank-and-file employees for the loss of economic benefits that might have been obtained had the employer bargained in good faith." *Frankl*, 2011 WL 3250637, at *23. Moreover, even if the Board did order such relief, monetary damages would not make the employees whole, because "[t]he value of the right to enjoy the benefits of union representation is immeasurable in dollar terms once it is delayed or lost." *Dunn*, 241 F.3d at 667 (quoting *Levine v. C & W Mining Co.*, 465 F. Supp. 690, 694 (N.D. Ohio), *aff'd* 610 F.2d 432 (6th Cir. 1979)).

Second, unions provide a range of non-economic benefits to employees that are not realized when an employer refuses to bargain with the union. For example, unions can ensure greater job security by negotiating seniority provisions into collective bargaining agreements and union representatives can represent employees during grievance and arbitration procedures. In sum, as the Supreme Court has explained, the "union [is] essential to give laborers opportunity to deal on an equality [sic] with their employer." *NLRB v. Jones & Laughlin*, 301 U.S. 1, 33 (1937). Employees who chose to be represented by the union, to bargain collectively, and to share common cause with their fellow employee will be denied those rights until the Board rules, absent an injunction. This harm is likely to be irreparable because the Board's "forward-looking order cannot fully compensate the employees . . . for the variety of benefits that good-faith collective bargaining

with the Union might otherwise have secured for them in the present." *Bloedorn*, 276 F.3d at 299.

Third, a failure to bargain in good faith threatens industrial peace. The Supreme Court has repeatedly recognized that the overriding policy of the NLRA is "industrial peace"; the NLRA secures this goal in part by "permit[ting] unions to develop stable bargaining relationships with employers, which will enable the unions to pursue the goals of their members, and this pursuit, in turn, will further industrial peace." *Fall River*, 482 U.S. at 38-39. In fact, "[t]he obligation of collective bargaining is the core of the Act, and the primary means fashioned by Congress for securing industrial peace." *Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970). Congress made this clear by including the following statement in the text of the NLRA:

> It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred *by encouraging the practice and procedure of collective bargaining* and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, *for the purpose of negotiating the terms and conditions of their employment* or other mutual aid or protection.

29 U.S.C. § 151 (emphases added). The Board cannot fashion a retroactive remedy for the harm to industrial peace that occurs during the period that the employer refuses to bargain.

Fourth, a delay in bargaining weakens support for the union, and a Board order cannot remedy this diminished level of support. We recently agreed with the Seventh Circuit and concluded that "[a]s time passes, the benefits of unionization

are lost and the spark to organize is extinguished. The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable." *Frankl*, 2011 WL 3250637, at *23 (quoting *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996)); *see also Machine Workers*, 426 F.2d at 1249.[17]

As the NLRB held nearly seventy years ago:

Employees join unions in order to secure collective bargaining. Whether or not the employer bargains with a union chosen by his employees is normally decisive of its ability to secure and retain its members. Consequently, the result of an unremedied refusal to bargain with a union, standing alone, is to discredit the organization in the eyes of the employees, to drive them to a second choice, or to persuade them to abandon collective bargaining altogether.

*Frankl*, 2011 WL 3250637, at *23 (quoting *Karp Metal Prods. Co.,* 51 N.L.R.B. 621, 624 (1943)). Once the union's support has diminished, it will likely suffer irreparable harm because "[w]ith only limited support . . . the Union will be unable to bargain effectively regardless of the ultimate relief granted by the board." *Dunn*, 241 F.3d at 667.

[14] CHHP attempts to distinguish our recent opinion in *Frankl* by arguing that in *Frankl* there was evidence in the record that the employer negotiated in bad faith, whereas in this case CHHP simply failed to negotiate at all. Although this is an accurate description of the facts in *Frankl,* it is not a per-

---

[17]The NLRB process sometimes takes years to conclude; but, "[t]ime is usually of the essence [in labor disputes]." *Frankl*, 2011 WL 3250637, at *1 (quoting *Miller*, 19 F.3d at 455 n.3) (alterations in original). "Congress recognized that delay is inherent in the procedures which it prescribed for settling labor disputes. That delay was cited as the reason for enacting section[ ] 10(j)." *Levine v. C & W Mining Co.*, 610 F.2d 432, 437 (6th Cir. 1979).

suasive means of distinguishing it with regard to the likelihood of irreparable harm. Irreparable harm is at least as likely to follow from a failure to bargain at all as from bargaining in bad faith. *Frankl* did not require that the Director demonstrate bad faith bargaining as opposed to a failure to bargain at all. In fact, *Frankl* observed that a "failure to bargain in good faith[ ] has long been understood as likely causing an irreparable injury to union representation." *Frankl*, 2011 WL 3250637, at *23. The text of the NLRA makes it illegal for an employer to "refuse to bargain," 29 U.S.C. § 158(a)(5), and then defines the obligation to bargain as *including* an obligation to do so in good faith, 29 U.S.C. § 158(d). Under the NLRA, if the union represents a majority of employees, an employer must bargain with that union *and* must do so in good faith. Under CHHP's proposed rule, however, the Director could establish a likelihood of irreparable harm if the employer did bargain but did so in bad faith, but could not meet this standard if the employer simply refused to engage in any bargaining.[18] Such a distinction is contrary to our caselaw, common sense, and the text of the NLRA. In many ways a refusal to bargain at all is more harmful than bargain-

---

[18]In addition, CHHP asserted at oral argument that we should also require the Director to show that the employer was engaged in anti-union activities, such as retaliatory firings of union members before finding a likelihood of irreparable harm. We rejected this argument in *Frankl* when we found a likelihood of irreparable harm resulting both from the failure to bargain in good faith *and* from the employer's retaliatory firing of union members. *See Frankl*, 2011 WL 3250637, at *23. As discussed above, CHHP's failure to bargain is likely to cause irreparable injury. We do note, however, that even if anti-union animus were required, and it is not, there is evidence in the record of such anti-union animus. First, Karykeion told the CNA that CHHP "would do whatever was necessary to make[ ] sure they didn't have the Union," and CHHP insisted that Karykeion reject the CBA before the purchase of Community was completed. Second, as the likelihood of success discussion demonstrates, under any interpretation of the numbers, the CNA represented a majority of the RNs in the bargaining unit. CHHP's implausible attempts to twist the numbers, including such tactics as labeling RNs as union incumbents on one list but not another, provide further evidence of anti-union animus.

ing but doing so in bad faith. As the Supreme Court held in *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937),

> [e]xperience has abundantly demonstrated that the recognition of the right of employees to self-organization and to have representatives of their own choosing for the purpose of collective bargaining is often an essential condition of industrial peace. *Refusal to confer and negotiate* has been one of the most prolific causes of strife. This is such an outstanding fact in the history of labor disturbances that it is a proper subject of judicial notice and requires no citation of instances.

*Id.* at 42 (emphasis added).

**[15]** The requirement that the bargaining be done in good faith is the second-part of a two-part analysis; the first requirement is that the employer recognize and enter into bargaining with the union. In other words, a failure to bargain at all is a *per se* failure to bargain in good faith. The Supreme Court erased any doubt on this question nearly fifty years ago in *NLRB v. Katz*, 369 U.S. 736 (1962):

> The duty 'to bargain collectively' enjoined by § 8(a)(5) is defined by § 8(d) as the duty to 'meet . . . and confer in good faith with respect to wages, hours, and other terms and conditions of employment.' Clearly, the duty thus defined may be violated without a general failure of subjective good faith; for there is no occasion to consider the issue of good faith if a party has refused even to negotiate in fact-'to meet . . . and confer'-about any of the mandatory subjects.

*Id.* at 742-43.

**[16]** In sum, a failure to bargain at all is likely to cause irreparable harm "absent some unusual circumstance indicat-

ing that union support is not being affected or that bargaining could resume without detriment as easily later as now." *Frankl*, 2011 WL 3250637, at *23. Those unusual circumstances are not present here, and therefore the district court did not abuse its discretion in finding a likelihood of irreparable harm.

**2.**

Moreover, even if a failure to bargain in good faith were not ordinarily enough to establish irreparable harm, the Supreme Court has found that employees' general interest in "being represented as soon as possible" is "especially heightened in a situation where many of the successor's employees, who were formerly represented by a union, find themselves after the employer transition in essentially the same enterprise, but without their bargaining representative." *Fall River*, 482 U.S. at 50. The Court discussed the irreparable harm that would result from the failure to recognize the union in the successor employer context: "[h]aving the new employer refuse to bargain with the chosen representative of these employees 'disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions.' " *Id.* (quoting *Franks Bros Co. v. NLRB*, 321 U.S. 702, 704 (1944)).[19] We agree with the Seventh Circuit that *Fall River* guides our irreparable harm inquiry in the successor employer context. *See Bloedorn*, 276 F.3d at 298 (quoting extensively from *Fall River*). In fact, as the Seventh Circuit held, "[g]iven the uncertainties that both the union and its members face during the transition, a successor's refusal to recognize the union . . . inflicts a particularly potent wound

---

[19]Of course, the Supreme Court noted that employers must also be able to rearrange their businesses when the need arises, and therefore employers are not obligated to bargain with the union if union incumbents do not comprise a majority of the bargaining unit at the successor employer. *Fall River*, 482 U.S. at 40. Here, as discussed above, the Director is likely to succeed on the merits of his claim that incumbents do constitute a majority of the bargaining unit.

on the union and its members." *Id.* Moreover, "[t]he longer that the successor employer is permitted to benefit from a state of affairs that its own wrongdoing has brought about, the less likely it is that a final order in the Board's favor will be able to redress the wrongs that have been done and to restore the status quo ante." *Id.* at 300.

**3.**

CHHP also argues that the Director has not demonstrated a likelihood of irreparable harm because the CNA could have sought a new election, thereby demonstrating that injunctive relief is not the only way to protect the CNA's interests. However, unions are entitled to a presumption of majority support after they are certified by the NLRB. *Fall River*, 482 U.S. at 39. In a successor employer situation, "the successor's duty is to recognize and bargain with the union from the outset, not simply to permit a new vote on the matter." *Bloedorn*, 276 F.3d at 298. As discussed above, without an injunction, the union is likely to lose support, and thus, an election at some future date would not be an adequate legal or equitable remedy.[20]

---

[20]CHHP relies on *McDermott* to argue that the Director's delay in filing the petition undermines his claim of irreparable harm. However, the *McDermott* court recognized that "delay by itself is not a determinative factor in whether the grant of interim relief is just and proper." 593 F.3d at 958 (internal quotation marks omitted). *McDermott* found that "delay is only significant if the harm has occurred and the parties cannot be returned to the status quo or if the board's final order is likely to be as effective as an order for interim relief." *McDermott*, 593 F.3d at 965. As we noted in *Frankl*, *McDermott* is distinguishable because in *McDermott*, we were applying a heightened standard due to the employer's First Amendment interests. *See Frankl*, 2011 WL 3250637, at *24 (citing *McDermott*, 593 F.3d at 958). Here, there are no such interests. Moreover, in *McDermott* we were deferentially reviewing the denial of an injunction, whereas in this case we are deferentially reviewing the grant of an injunction. *See id.* at *25. Finally, in *McDermott*, the remedy at issue was reinstatement of employees, and we noted that "the parties appear[ed] to be waiting for the Board's adjudication." *McDermott*, 593 F.3d at 965. Here, the question is one of good faith bargaining, and just as in *Frankl*, the

**4.**

As the *Frankl* court held, the "same evidence and legal conclusions" relevant to likelihood of success, "along with permissible inferences regarding the likely interim and long-run impact of the unfair labor practices that were likely to be found, preclude the conclusion that the District Court abused its discretion in finding a likelihood of irreparable harm." *Frankl*, 2011 WL 3250637, at *23. Here permissible inferences regarding the impact of the failure to bargain in good faith lead us to conclude that the district court did not abuse its discretion in finding a likelihood of irreparable harm.

## C.   Balance of the Equities

[17] "In considering the balance of hardships, the district court must take into account the probability that declining to issue the injunction will permit the alleged unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority." *Frankl*, 2011 WL 3250637, at *25 (quoting *Miller*, 19 F.3d at 460) (internal brackets omitted). Without an injunction, CHHP "will have succeeded at least for now in its efforts to resist the union organizing effort." *Dunn*, 241 F.3d at 667 (quoting *Levine*, 465 F. Supp. at 694). Additionally, if support for the CNA decreases without an injunction, the CNA "will be unable to bargain effectively regardless of the ultimate relief granted by the [NLRB]." *Id.* Therefore, "the District Court's determination

---

union in this case is willing and able to represent the workers. Thus, "the possibility that a collective bargaining agreement could be reached in the interim and statutory rights restored qualifies as relief that could not be achieved retroactively through an NLRB order." *Frankl*, 2011 WL 3250637, at *25. Moreover, in *Frankl* we held that delay did not undermine the Director's irreparable harm argument even though there was a nearly three year delay. *Id.* at *24. Here, the Director filed a § 10(j) petition less than three months after the union filed an unfair labor practice complaint.

that the Regional Director had shown likely irreparable harm to the collective bargaining process meant that there was also considerable weight on his side of the balance of the hardships." *Frankl*, 2011 WL 3250637, at *25.

[18] On the other side of the balance of the equities, when "[t]he company is not compelled to do anything except bargain in good faith," the risk from a bargaining order is "minimal." *Dunn*, 241 F.3d at 667. The employer is not required by such an order to do anything that would cause it harm; it need do nothing more than follow the ordinary obligations of an employer under the law. If the injunction is upheld, CHHP would of course suffer the financial and administrative costs of good faith bargaining; these costs, however, are borne by both the union and the employer and are comparatively minor. *Id.* at 668.

CHHP argues that the district court erred because it failed to consider that Community recently emerged from bankruptcy. Therefore, CHHP argues, a preliminary injunction would not just include bargaining costs, but would threaten Community's viability.[21] CHHP alleges that to reach an agreement with the CNA, it:

> will almost certainly have to agree to one or more of the contractual provisions that led Community down the path to bankruptcy in the first place. If the ordered negotiations are unsuccessful, [CHHP] will be faced with the prospect of a strike, which would be equally disastrous, not only to Community's

---

[21]Of course, CHHP has not shown that the CBA for RNs led to Karykeion's bankruptcy. RNs are just one part of a hospital's staff; Karkyeion employed hundreds of other employees. Moreover, even if the CBA had led to the bankruptcy, as discussed above, CHHP is not required to adopt the CBA; in addition, according to CHHP's own assertions, it has already fixed several of the cost overruns that led to the bankruptcy in the first place.

financial viability, but to the availability of health care services to the community.

CHHP does not explain why we should assume that the CNA would be so unreasonable as to insist on terms that would put Community out of business.[22] More important, even if the CNA does persist in its demand that CHHP adopt Karykeion's contractual provisions, CHHP is not required to acquiesce in this demand. The district court merely ordered CHHP to bargain in good faith. In so bargaining, "[a]n employer is not required to make concessions or yield any position fairly maintained, but is obliged to make *some* reasonable effort in *some* direction to compose his differences with the union." *Frankl*, 2011 WL 3250637, at *19 (internal quotation marks and citations omitted) (quoting *Regency Serv. Carts, Inc.*, 345 N.L.R.B. 671, 671 (2005)).

**[19]** Finally, CHHP argues that if the NLRB ultimately sides with CHHP, it would face the "impossible prospect of 'undoing' its agreement," thereby creating "unexplained levels of uncertainty which [would] result in extreme prejudice" to CHHP. CHHP's argument would lead to the conclusion that a district court in § 10(j) proceedings could never order the parties to bargain in good faith. *See Dunn*, 241 F.3d at 669. As we explained above, our cases reject any such conclusion. Moreover, "the union should not bear the burden of

---

[22]Indeed many unions across the country have agreed to contract concessions in order to protect the long-term viability of their companies and their jobs. *See* Terrence Dopp, *New Jersey Turnpike Board Accepts Givebacks to Avoid Firings*, Bloomberg Businessweek, July 1, 2011, http://www.bloomberg.com/news/2011-04-29/new-jersey-turnpike-board-accepts-toll-worker-givebacks-to-avoid-firings.html (noting that unions agreed to "nearly all stipulations sought by the authority," including voting to accept wage cuts, in order to save jobs); David Bailey, *UAW workers ratify concessions to Ford*, Reuters, Mar. 9, 2009, http://www.reuters.com/ article/2009/03/09/us-ford-uaw-idUSTRE5286AI 20090309 (noting that the United Auto Workers had agreed to contract concessions "in order to be part of the solution" to the problems facing Ford during the recession).

recovering from the company's illegal activities." *Dunn*, 241 F.3d at 668.[23] Weighing these competing interests, we hold that it was not an abuse of discretion for the district court to find that the balance of equities weighed in favor of granting an injunction.

## D.  Public Interest

**[20]**  Lastly, the district court found that "it would be in the public interest to recognize the CNA as the collective bargaining representative pending ultimate determination of the alleged unfair labor practices." "In § 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge." *Frankl*, 2011 WL 3250637, at *26 (quoting *Miller*, 19 F.3d at 460). Moreover, the public interest favors applying federal law correctly. *See N.D. v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1113 (9th Cir. 2010) ("[I]t is obvious that compliance with the law is in the public interest."). Therefore, "ordinarily . . . when, as here, the Director makes a strong showing of likelihood of success and of likelihood of irreparable harm, the Director will have established that preliminary relief is in the public interest." *Frankl*, 2011 WL 3250637, at *26. The district court did not abuse its discretion in finding that the public interest supports the grant of a preliminary injunction.

**[21]**  In sum, the district court correctly applied the *Winter* factors and did not abuse its discretion in granting the preliminary injunction.

---

[23]Moreover, the CNA and CHHP would be bargaining with the knowledge of the NLRB's continuing proceedings; therefore, any agreements could provide for an exception if the NLRB ultimately ruled for CHHP. *See Asseo v. Pan American Grain Co., Inc.*, 805 F.2d 23, 28 (1st Cir. 1986) ("The employer can condition the continued efficacy of an agreement (if indeed any agreement is reached) upon the final disposition by the Board.").

## V.

CHHP also argues that even if the injunction was proper under *Winter*, the district court impermissibly infringed on the NLRB's authority. This argument misapprehends the purpose of § 10(j), which is " 'to preserve the [NLRB's] remedial power while it processes the charge.' " *McDermott*, 593 F.3d at 957 (quoting *Miller*, 19 F.3d at 459-60). The § 10(j) scheme responds to the delay inherent in the NLRB's processes; under § 10(j), the NLRB can petition the courts for an injunction so that it can decide the issue in due course without allowing the unfair labor practice to reach fruition. That is exactly what the Board did here; thus it is illogical to suggest that the grant of an injunction in the circumstances contemplated by the statute infringes on the NLRB's authority as delineated by that statute. Rather, CHHP's argument is, in essence, an implicit attack on the legality of § 10(j), which has been a fundamental part of our labor law for over 60 years and has been regularly applied by the courts throughout that entire period. We reject this argument as clearly contrary to well established law.

CHHP seeks to distinguish this case from others where preliminary injunctions were granted because, CHHP argues, this case involves a "complicated" employee headcount issue. CHHP argues that representational issues should be resolved by the NLRB, not the courts, citing to *Hotel Employees, Restaurant Employees Union, Local 2 v. Marriott Corp.*, 961 F.2d 1464, 1468 (9th Cir. 1992). First, the headcount in this case is not complicated, and to the extent it appears so, it is only due to CHHP's obfuscation of the basis for its employee counts. Moreover, even if this were a complicated issue, the district court's decision is guided by the four W*inter* factors; we reject CHHP's attempt to add in a fifth factor: complexity of the issues.

Second, while *Marriott* did discuss the NLRB's primary jurisdiction over representational issues, it did not deal with

successorship issues of the kind we confront here. Successorship issues are not representational issues in the sense *Marriott* discussed. In *Marriott* and what are called "R" cases, the focus of inquiry is the certification or decertification decision. In successorship cases, on the other hand, the question is not whether the union actually is the choice of a majority but whether it *continues* to enjoy incumbent status, such that the obligation to bargain continues unless the union is decertified.

Third, *Marriott* was not a § 10(j) case. The purpose of a § 10(j) injunction is not to decide the issue and remove it from the NLRB's jurisdiction, but rather " 'to preserve the [NLRB's] remedial power while it processes the charge.' " *McDermott*, 593 F.3d at 957 (quoting *Miller*, 19 F.3d at 459-60); *see also Levine*, 465 F. Supp. at 691 ("By seeking temporary injunctive relief, the Board does not surrender its authority to determine the merits of the charges filed."). The district court's injunction *preserves* rather than *impinges* upon the NLRB's authority.

Finally, CHHP argues that the scope of the injunction impinged on the NLRB's authority because the district court ordered CHHP to embody any agreement in writing.[24] In essence, CHHP argues that the district court ordered relief which should only be ordered by the NLRB. But, we recently rejected that exact argument, finding that "in most bad-faith bargaining cases, a § 10(j) remedy *will* be identical, or at least very similar, to the Board's final order." *Frankl*, 2011 WL 3250637, at *26.[25]

---

[24]CHHP also asks for a six-month temporal limitation on the district court's preliminary injunction. The *Frankl* court found that the district court was not required to enter such a limitation and therefore could not have abused its discretion in deciding not to do so. *Frankl*, 2011 WL 3250637, at *26 n.18. The same logic applies in this case. We also find no error in the district court's request for a status report on compliance with the preliminary injunction.

[25]The district court's order in *Frankl* required the parties to "embody [any] understanding in a signed agreement," the exact language at issue here. *See also Norelli v. HTH Corp.*, 699 F. Supp. 2d 1208, 1208 (D. Haw. 2010).

The district court did not abuse its discretion in granting the preliminary injunction; moreover, it did not impermissibly infringe on the NLRB's authority. Accordingly, the district court's order is **AFFIRMED**.