**Richard AHEARN, Regional Director of the Nineteenth Region of the National Labor Relations board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**REMINGTON LODGING AND HOSPITALITY, d/b/a/ The Sheraton Anchorage, Respondent.**

**Case No. 3:11–cr–00240–TMB.**

United States District Court, D. Alaska.

Feb. 2, 2012.

Anne P. Pomerantz, Mara–Louise Anzalone, Susannah C. Merritt, Victoria Lynne Perkins, National Labor Relations Board, Seattle, WA, Edward Bryan Wilson, U.S. Attorney's Office, Anchorage, AK, for Petitioner.

Arch Y. Stokes, Karl Montague Terrell, Peter Glenn Fischer, Stokes Roberts & Wagner, Atlanta, GA, for Respondent.

**1.** Dkt. 1; 29 U.S.C. § 160(j).

**2.** Dkt. 35.

**3.** Dkts. 14, 52, 71.

**4.** Dkt. 72.

## ORDER

TIMOTHY M. BURGESS, District Judge.

## I. INTRODUCTION

Petitioner Richard Ahearn has brought this action for and on behalf of the National Labor Relations Board ("NLRB" or "Board") against Respondent Remington Lodging and Hospitality, LLC, d/b/a/ the Sheraton Anchorage, seeking preliminary injunctive relief under § 10(j) of the National Labor Relations Act ("NLRA").[1] Respondent filed an "Answer and Opposition" to the Petition[2] and both Parties filed supporting memoranda.[3] The Court held an evidentiary hearing on January 24, 2012.[4] At the hearing, the Parties had the opportunity to call witnesses and introduce evidence. Respondent eventually introduced two exhibits.[5] Otherwise, the Parties chose to rest their submissions and oral argument. For the reasons discussed in detail below, the Petition is GRANTED.

## II. BACKGROUND

### A. Regulatory Framework

NLRA § 7 "guarantees employees the right to 'self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.'"[6] Section 8 prohibits employers from engaging in unfair labor practices ("ULPs"), such as interfering with employees' self-organization and collective bargaining rights, interfering with labor unions, discriminating against employees in

**5.** *See* Dkt. 73.

**6.** *NLRB v. Ne. Land Servs., Ltd.,* 645 F.3d 475, 481 (1st Cir.2011) (quoting 29 U.S.C. § 157).

the terms and conditions of their employment in order to encourage or discourage membership in unions, discriminating against employees where they have filed ULP charges or provided testimony in an NLRA proceeding, and refusing to bargain collectively with the employees' representatives.[7]

The NLRA also provides that the Board may adjudicate labor disputes and collective bargaining representation issues.[8] As part of its duties, the Board adjudicates ULP charges filed by private parties.[9] The NLRB's General Counsel is tasked with investigating ULP charges, and determining whether to issue administrative complaints, leading to adjudications before the Board.[10] The General Counsel has delegated the initial power to decide whether or not to issue complaints to various regional directors.[11] Petitioner is the Regional Director for Region 19, which includes Alaska.

NLRB processes can be time consuming, leading to a risk that those violating the NLRA may "accomplish their unlawful objective before being placed under any legal restraint and thereby to make it impossible or not feasible for the Board to restore the status quo."[12] In recognition of this problem, Congress enacted NLRA § 10(j), which provides that:

The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.[13]

The Board authorized Petitioner to seek injunctive relief in this action on December 5, 2011.[14]

### B. The Parties' Dispute

Respondent manages the Sheraton Hotel in Anchorage, Alaska.[15] Respondent has been engaged in disputes with the Hotel workers' union, UNITE HERE, Local 878 ("Union"), since late 2008, in anticipation of the expiration of their collective bargaining agreement in early 2009. The facts underlying these disputes are summarized below.

Upon assuming control of the Hotel operations in December 2006, Respondent

---

7. 29 U.S.C. § 158(a).

8. §§ 159–60.

9. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 138, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975) (citing §§ 153(d), 160(b)).

10. *Sears*, 421 U.S. at 138–39, 95 S.Ct. 1504 (citations omitted).

11. *Id.* at 139, 95 S.Ct. 1504 (citing 29 C.F.R. §§ 101.8, 102.10).

12. *Frankl v. HTH Corp.*, 650 F.3d 1334, 1340 (9th Cir.2011) (quoting *Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 455 n. 3 (9th Cir.

1994), *abrogated on other grounds by Winter v. Natural Res. Def. Council*, 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)).

13. 29 U.S.C. § 160(j).

14. *See* NLRB, *10(j) Injunction Activity at the National Labor Relations Board*, https://mynlrb.nlrb.gov/portal/nlrb.pt?open=512&objID=220&mode=2 (last visited Jan. 30, 2012).

15. *See* Dkt. 1 ¶ 12(a); Dkt. 35 ¶ 12.a.

distributed an employee handbook to the employees containing the following provisions:

Rule 1: employees "agree not to return to the hotel before or after their working hours without authorization from their manager," ...

Rule 2: "distribution of any literature, pamphlets, or other material in a guest or work area is prohibited. Solicitation of guests by associates at anytime for any purpose is also inappropriate," ...

Rule 3: "Insubordination or failure to carry out a job assignment or job request of management is prohibited," ...

Rule 4: employees "must confine their presence in the hotel to the area of their job assignment and work duties. It is not permissible to roam the property at will or visit other parts of the hotel, parking lots, or outside facilities without the permission of the immediate Department Head," ...

Rule 5: "conflict of interest with the hotel or company is not permitted,".

Rule 6: "Behavior which violates common decency or morality or publicly embarrasses the Hotel or Company" is prohibited, ...

Rule 7: employees are prohibited from disclosing confidential information, including "personnel file information" and "labor relations" information; when disclosure is required "by judicial or administrative process or order or by other requirements of law," employees must "give ten days' written notice to Respondent's legal department prior to disclosure," ... and

Rule 8: employees may not "give any information to the news media regarding the Hotel, its guests, or associates, without authorization from the General Manager and to direct such inquiries to his attention,".... [16]

It does not appear that these rules were controversial until the parties' negotiations began to break down.

Beginning in July, and continuing through September 2009, Respondent began reassigning security duties, which had traditionally been fulfilled by individuals outside of the Union bargaining unit, to hotel engineers [17] who were bargaining unit employees. Respondent eventually discontinued this practice.

After extensions, the collective bargaining agreement expired in August 2009. On August 21, 2009, Respondent sent the Union its "final proposal" along with a cover letter indicating that Respondent was "open to discussing" it. Respondent subsequently declared an impasse in negotiations. In mid-October of 2009, Respondent began implementing certain aspects of its "final proposal," including requiring housekeepers to clean 17 rooms per shift, requiring employees to clock in and out for lunch, and requiring employees to pay a nominal fee for meals. Respondent admittedly did not notify the Federal Mediation and Conciliation Service ("FMCS") of these changes as it is required to do under the NLRA.

On November 17, 2009, nine employees presented Respondent's general manager with a boycott petition in the Hotel lobby signed by approximately 84 percent of the employees in protest of Respondent's failure to bargain and its implementation of the aspects of the "final proposal." Respondent subsequently disciplined the nine employees and suspended two of them for violating rules in the employee handbook. Thereafter, on December 8, 2009, another one of Respondent's managers demanded

---

**16.** Dkt. 6 Ex. 5 at 14 (alteration marks and citations omitted).

**17.** The hotel engineers are responsible for maintenance and mechanical work. Dkt. 6 Ex. 6 at 83. They were never provided with any security training. *See id.* at 27.

that an employee remove a pro-Union button and confiscated the button, as well as several others that the employee had in her possession. In negotiation sessions that same month, the parties were unable to make any progress; however, the Union did provide some individuals affiliated with Respondent with a document labeled a "non proposal" which included potential changes to its position on several issues.

On February 2, 2010, four employees were handing out flyers supporting the boycott at the front and back entrances of the Hotel. The employees left after a manager told them that under the rules in the employee handbook, they were trespassing, and that she had called the police. The employees were subsequently terminated for violating Hotel policy. Later in the year (although it is not clear exactly when), Respondent offered the employees the opportunity to return to work with full back pay and seniority, which all accepted. Respondent did not make any announcements to its employees concerning the reinstatement.

During negotiation sessions in early March of 2010, the Union offered a "package" proposal offering compromises on several disputed issues similar to those contemplated by the "non proposal" (including the number of rooms that housekeepers would clean, medical insurance rates, and wage increases) with the caveat that if Respondent rejected any aspect of the proposal, it should be considered "withdrawn." Additionally, one key point of contention during the negotiations was Respondent's proposal to replace its commitment to funding the existing union-sponsored Taft–Hartley health and welfare plan with a provision allowing it to "shop-and-compare" the medical insurance plan on an annual basis. Respondent initially proposed a Cigna policy. In March, Respondent altered its prior proposal to replace the Taft–Hartly plan with a plan from Aetna. Nonetheless, negotiations quickly broke down with Respondent's lead negotiator declaring an impasse and the Union team walking out after the two sides exchanged "heated words." Thereafter, the Union expressed a continued willingness to negotiate, while the Respondent held to its position that the parties were at an impasse. Respondent subsequently implemented the Aetna plan.

Respondent allegedly then began to solicit the employees to sign a decertification petition. In subsequent proceedings, Respondent contends that only three employees testified that they were coerced into signing the petition while 65 other employees who signed the petition did not mention any management influence when testifying about their decision to sign the decertification petition. A number of employees presented the petition to management on May 20, 2010. Based on the petition, Respondent subsequently withdrew recognition from the Union on July 2, 2010.

After these events, several changes to the parties' regular course of conduct took place. On June 11, 2010, the Union requested information from Respondent concerning the employees, including an updated employee roster and information about disciplinary incidents. Respondent never provided this information. In July 2010, Respondent announced that it would no longer give scheduling preference to employees by seniority as it had under the expired collective bargaining agreement. Respondent also barred Union representatives from the Hotel. Furthermore, Respondent stopped making payments to the Union pension trust fund, but later entered into a settlement agreement with the fund.

### C. NLRB Proceedings

As a result of the incidents described above, the Union filed a number of ULP

charges. Petitioner subsequently issued three complaints based on the Union charges. Hearings are ongoing before Administrative Law Judge Gregory Z. Meyerson (the "ALJ").

On August 25, 2011, the ALJ issued a lengthy decision on the charges in the first two complaints (the "ALJ Decision").[18] Most notably, the ALJ found that the parties had reached an impasse in negotiations by October of 2009, but that the impasse was broken by the proposals exchanged in March of 2010. He also credited the testimony of those employees who indicated that management had coerced them into signing the decertification petition. He accordingly found that Respondent violated the NLRA § 8 by:

a) unilaterally assigning Union engineers security duties which had been fulfilled by non-bargaining unit employees in the summer of 2009 without prior notification;

b) making unilateral changes to its employees' terms and conditions of employment regarding the number of rooms housekeeping employees were expected to clean and meals without notifying FMCS;

c) disciplining several employees on November 19, 2009, for presenting a boycott petition to Respondent's general manager;

d) confiscating pro-Union buttons from employees;

e) suspending and terminating several employees for distributing handbills to the public in front of the Hotel as part of the boycott effort;

f) maintaining and enforcing the handbook rules discussed above;

g) prematurely declaring an impasse in collective bargaining on or about March 11, 2010, and refusing to negotiate with the Union thereafter;

h) coercing and soliciting employees into signing a decertification petition with threats and promises of favorable treatment if they signed it;

i) withdrawing recognition of the Union since July 2, 2010, without possessing untainted objective evidence that the Union had lost majority support;

j) interrogating employees regarding their support for the Union;

k) denigrating the Union in the eyes of the employees by informing them that it intended to unilaterally change their medical insurance benefits; and

l) making unilateral changes to its employees' terms and conditions of employment by changing the medical insurance plan.[19]

Respondent has filed exceptions to the ALJ Decision with the Board.[20]

The third complaint is the subject of the ongoing hearings before the ALJ. In it, Petitioner contends that Respondent violated the NLRA by: (a) ceasing to make payments to the pension plan; (b) banning the Union and its representatives from the Hotel; (c) failing to consider seniority in making work assignments; and (d) refusing to provide the Union with information relating to the employees.[21]

### III. LEGAL STANDARD

▅▅▅ The purpose of § 10(j) is to "protect the integrity of the collective bargaining process and to preserve the NLRB's remedial power while it processes" LLP complaints.[22] In determining whether re-

---

18. Dkt. 6 Ex. 5.

19. *Id.* at 101–03.

20. Dkt. 7 Ex. 6.

21. Dkt. 7 Ex. 10.

22. *Small v. Avanti Health Sys., LLC,* 661 F.3d 1180, 1187 (9th Cir.2011) (quoting *McDer-*

lief under § 10(j) is appropriate, "district courts consider the traditional equitable criteria used in deciding whether to grant a preliminary injunction" as follows:

> A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.[23]

"Serious questions going to the merits and a balance of hardships that tips sharply towards the Regional Director can support issuance of a preliminary injunction, so long as the Regional Director also shows that there is a likelihood of irreparable harm and that the injunction is in the public interest." [24]

█ The Ninth Circuit has not formally decided how much weight to give to an ALJ decision in a § 10(j) proceeding.[25] It has noted, however, that the Seventh Circuit provided a "compelling" assessment of the value of an ALJ decision when that court explained that it chose to rely on such a decision because:

> assessing the Director's likelihood of success calls for a predictive judgment about what the Board is likely to do with a case. The ALJ is the Board's first-level

decisionmaker. Having presided over the merits hearing, the ALJ's factual and legal determinations supply a useful benchmark against which the Director's prospects of success may be weighed.[26]

Nonetheless, it is also clear that an ALJ's decision is not dispositive.[27]

## IV. DISCUSSION

Petitioner contends that injunctive relief is "just and proper" here because: (a) there is a strong likelihood that it will succeed before the Board; (b) the employees will be irreparably harmed without any such relief; (c) the equities support injunctive relief; and (d) injunctive relief is in the public interest. Respondent disputes all of these contentions. For the reasons discussed below, the Court agrees with Petitioner. However, as the terms of the injunction proposed by Petitioner are somewhat broad, the Court will enter a more narrowly tailored injunction specifically addressed to the harms at issue here.

### A. Likelihood of Success

█ "On a § 10(j) petition, likelihood of success is a function of the probability that the Board will issue an order determining that the unfair labor practices alleged by the Regional Director occurred

mott v. Ampersand Publ'g, LLC, 593 F.3d 950, 957 (9th Cir.2010)).

**23.** *Id.* (quoting *Ampersand,* 593 F.3d at 957, and *Winter v. Natural Res. Def. Council,* 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (alteration marks original)).

**24.** *Frankl v. HTH Corp.,* 650 F.3d 1334, 1355 (9th Cir.2011) (quoting *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir.2011) (alteration marks omitted)).

**25.** *Avanti,* 661 F.3d at 1186.

**26.** *Id.* (quoting *Bloedorn v. Francisco Foods, Inc.,* 276 F.3d 270, 288 (7th Cir.2001) (alteration marks omitted)).

**27.** *See McDermott v. Ampersand Publ'g, LLC,* 593 F.3d 950, 964 (9th Cir.2010) ("The fact that 'the General Counsel issued a complaint and an ALJ ruled in favor of the General Counsel by no means foreordains the Board's decision." (citing *Overstreet v. United Bhd. of Carpenters & Joiners of Am.,* 409 F.3d 1199, 1207 n. 12 (9th Cir.2005))); *Overstreet,* 409 F.3d at 1207 n. 12 (quoting Richard B. Lapp, *A Call for a Simpler Approach: Examining the NLRA's Section 10(j) Standard,* 3 U. Pa. J. Lab. & Emp. L. 251, 291 (2001), for the proposition that "in cases involving petitions for injunctions, 'it is not uncommon for the Board to overturn an ALJ decision that found in favor of the General Counsel' ")).

and that [the Ninth Circuit] would grant a petition enforcing that order, if such enforcement were sought."[28] Where the Board approves a § 10(j) petition, the regional director "is owed special deference because 'likelihood of success is a function of the probability that the Board will issue an order determining that the'" ULPs occurred.[29] The Board's decision to approve the § 10(j) petition thus may "signal its future decision on the merits."[30] A court should also account for the fact that the appellate court must defer to the Board's determinations in enforcement actions.[31] A regional director "can make a threshold showing of likelihood of success by producing some evidence to support the unfair labor practice charge, together with an arguable legal theory."[32]

■ Petitioner contends that the Board is likely to find that Respondent's following conduct violated the NLRA: (1) implementing unilateral changes in the engineer's duties; (2) failing to give FMCS notice before implementing unilateral changes; (3) disciplining and discharging employees for Union activity; (4) maintaining and enforcing the handbook rules listed above; (5) confiscating Union buttons; (6) declaring impasse prematurely, refusing to bargain thereafter, and unilaterally changing the medical insurance plan; (7) withdrawing recognition from the Union; and (8) failing to provide information and making unilateral changes after withdrawing recognition. As discussed below, Respondent disputes nearly all of these points.

### 1. Security Duties

■ Petitioner contends that Respondent unilaterally reassigned security duties from the security guards to the hotel engineers without notifying or consulting the Union as required by the Act. Respondent suggests that this contention is unfounded because it rests on the "dubious" testimony of one witness. The ALJ's credibility determinations, however, are generally entitled to "great deference ... unless they are inherently incredible or patently unreasonable."[33] On the present record, the Court cannot conclude that the ALJ's determination was "incredible or patently unreasonable." Accordingly, the Court concludes that Petitioner is likely to succeed on the merits with respect to this alleged violation.

### 2. FMCS Notice

Under NLRA § 8(d)(3), an employer must provide FMCS with notice before implementing its proposed changes to a collective bargaining agreement.[34] Respondent does not dispute that it failed to provide the required notice before it implemented aspects of its "final proposal" in October of 2009; rather, it contends that the Union provided the notice, relieving it of its responsibility to do so.

■ In support of this contention, Respondent relies on a pleading filed by

28. *Frankl v. HTH Corp.*, 650 F.3d 1334, 1355 (9th Cir.2011) (citing *Ampersand*, 593 F.3d at 964).

29. *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1187 (9th Cir.2011) (citing *Frankl v. HTH Corp.*, 650 F.3d 1334, 1355 (9th Cir. 2011)).

30. *Id.*

31. *Id.* (citing *Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 460 (9th Cir.1994), *abrogated on other grounds by Winter v. Natural Res. Def.*

Council, 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)).

32. *Avanti*, 661 F.3d at 1187 (citing *Frankl*, 650 F.3d at 1356).

33. *Healthcare Emps. Union v. NLRB*, 463 F.3d 909, 914 n. 8 (9th Cir.2006) (citing *Retlaw Broad. Co. v. NLRB*, 53 F.3d 1002, 1006 (9th Cir.1995)).

34. *See* 29 U.S.C. § 158(d)(3).

FMCS which indicates that the Union had filed a notice "advising FMCS of the contract termination." [35] However, it is not clear when this notice was provided to FMCS.[36] Nor does Respondent contend that the Union's notice addressed the modifications that it made to the terms and conditions of employment in October of 2009. As the authority relied on by Respondent explains, where a party seeks to rely on the other party's notification, it bears the risk that "the notice sent by the other party was ineffective to apprise the mediation services of the particular dispute." [37] Here, Respondent admits that it did not send the required notice and the evidence it relies upon does not establish that the Union's notification relieved it of that obligation. Accordingly, the Court finds that Petitioner is likely to succeed on the merits with respect to this claim.

### 3. Disciplines and Discharges

Petitioner argues that Respondent wrongfully disciplined nine employees for presenting a boycott petition to its general manager in November of 2009 and wrongfully discharged four employees for distributing handbills in February of 2010. Respondent contends that these actions were proper and notes that the four discharged employees were reinstated. Petitioner argues that the reinstatement did not remedy the violation because Respondent did not repudiate the conduct in an unambiguous and timely manner, and failed to adequately publicize its repudiation and ensure the employees that it would not interfere with their § 7 rights.

 Under Board precedent, presenting a petition to management [38] and distributing handbills at the entrances of a hotel [39] are protected § 7 activities.[40] Additionally, repudiation is only effective where it is "timely, unambiguous, specific in nature to the coercive conduct, and free from other proscribed illegal conduct." [41] Furthermore, the employer must adequately publicize the repudiation and "give assurances to the employees that in the future their employer will not interfere with the exercise of their Section 7 rights." [42]

Contrary to Respondent's suggestion,[43] these decisions are on-point here, and the Court concludes that the Board is likely to follow them. Respondent's reinstatement of the four discharged employees after being threatened with the prospect of a § 10(j) petition on that issue indicates that it recognized the weakness of its own position.[44] That reinstatement, however, was not sufficient to remedy the violation as it failed to adequately repudiate its conduct [45] or assure the employees that it

**35.** See Dkt. 58 Ex. 9 at 2.

**36.** Respondent admits that it does not know when the notice was filed. See Dkt. 7 Ex. 6 at 30 n. 18.

**37.** See NLRB v. Mar–Len Cabinets, Inc., 659 F.2d 995, 998 (9th Cir.1981) (citation omitted).

**38.** Superior Travel Serv., Inc., 342 N.L.R.B. 570, 574 (2004).

**39.** Santa Fe Hotel, Inc., 331 N.L.R.B. 723, 723 (2000).

**40.** Similarly, an employer may not fire employees for their union involvement. See Frankl v. HTH Corp., 650 F.3d 1334, 1362 (9th Cir.2011) (citation omitted).

**41.** Passavant Mem'l Area Hosp., 237 N.L.R.B. 138, 138 (1978) (citations and internal quotation marks omitted).

**42.** Id. at 138–39 (citations omitted).

**43.** Dkt. 52 at 30 (arguing that the Santa Fe decision is distinguishable and constitutes "bad precedent grounded on bad precedent").

**44.** See Dkt. 58 Ex. 12.

**45.** Indeed, Respondent continues to argue that its conduct was proper.

would not interfere with their § 7 rights in the future. Accordingly, the Court concludes that Petitioner is likely to succeed on the merits with respect to this issue.

#### 4. Handbook Rules

Petitioner contends that the handbook rules violate the NLRA because they have been applied by Respondent to restrict the employees' § 7 rights and are overly broad. In response, Respondent argues that the rules are legitimate, that it properly enforced them, and notes that the rules (or similar rules) have been in place for many years.

■■■ Maintenance of a rule that explicitly restricts protected § 7 activities is unlawful.[46] Regardless, even where a rule does not explicitly restrict § 7 activity, it is still unlawful where: "(1) employees would reasonably construe the language to prohibit Section 7 activity; (2) the rule was promulgated in response to union activity; or (3) the rule has been applied to restrict the exercise of Section 7 rights."[47] Protected § 7 activities include discussing the terms and conditions of employment with others,[48] including the media.[49]

Here, it is undisputed that Respondent invoked the first six rules at issue in disciplining and discharging several of its employees. As discussed above, the Court has concluded that Petitioner is likely to succeed on its claim that those actions violated the NLRA. Additionally, as Petitioner correctly argues, employees would reasonably construe Rule 7 to restrict their right to discuss the terms and conditions of their employment with others. Similarly, Rule 8 explicitly restricts the employees' right to communicate with the media.[50] Accordingly, the Court concludes that Petitioner is likely to succeed on the merits with respect to the handbook rules.

#### 5. Confiscation of Union Buttons

Petitioner contends that the manager's confiscation of an employee's Union buttons in December of 2009 violated the NLRA. Respondent does not appear to contest this issue.[51] Accordingly, the Court finds that Petitioner is likely to succeed on the merits on this issue.

#### 6. Declaration of Impasse

Petitioner argues that the ALJ correctly determined that Respondent prematurely declared impasse in March 2010. Accordingly, Petitioner argues Respondent's subsequent refusal to bargain with the Union and unilateral replacement of the Taft–Hartley medical plan with the Aetna plan violated the Act. Respondent argues that the ALJ "erred badly" on this point, and that the information exchanged by the parties was not sufficient to break the impasse that the ALJ found existed as of October 2009. Accordingly, Respondent contends that it was entitled to replace the medical plan.

---

**46.** *Martin Luther Mem'l Home, Inc.,* 343 N.L.R.B. 646, 646 (2004).

**47.** *Id.* at 646–47.

**48.** *See NLRB v. Ne. Land Servs., Ltd.,* 645 F.3d 475, 481–83 (1st Cir.2011) (citations omitted); *Cintas Corp. v. NLRB,* 482 F.3d 463, 468–70 (D.C.Cir.2007) (citations omitted).

**49.** *See Crowne Plaza Hotel,* 352 N.L.R.B. 382, 385–86 (2008); *see also Trump Marina Assocs., LLC v. NLRB,* 435 Fed.Appx. 1, 2 (D.C.Cir.2011) (citations omitted).

**50.** *Cf. Crowne Plaza,* 352 N.L.R.B. at 386 (finding that a narrower rule was "susceptible to the reasonable interpretation that it bars Section 7 activity").

**51.** Before the ALJ, Respondent's primary argument on this issue was that the employee was not credible. *See* Dkt. 6 Ex. 5 at 85–86. However, the ALJ found that she was credible and his credibility findings are entitled to deference. *See Healthcare Emps. Union v. NLRB,* 463 F.3d 909, 914 n. 8 (9th Cir.2006) (citing *Retlaw Broad. Co. v. NLRB,* 53 F.3d 1002, 1006 (9th Cir.1995)).

 The NLRA requires employers to bargain in good faith with the representatives of their employees to impasse.[52] An employer violates § 8 where it "makes a unilateral change in a term or condition of employment without first bargaining to an impasse on that term."[53] "An impasse occurs when 'good faith negotiations have exhausted the prospects of concluding an agreement, leading both parties to believe that they are at the end of their rope.' "[54] Whether an impasse exists is a "case-specific inquiry" that may depend on the following considerations: "the bargaining history, the good faith of the parties in negotiation, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, and the contemporaneous understanding of the parties as to the state of negotiations."[55] Even where an impasse exists, however, it does "not 'permanently relieve the parties of the duty to deal with each other.' "[56] Once an impasse is reached, "the duty to bargain about the subject matter of the impasse merely becomes dormant until changed circumstances indicate that an agreement may be possible.[57]" "[T]he burden of proof lies with the party claiming an impasse."[58]

In this case, in March 2010 the Union officially put forward a "package" proposal that included new positions on heavily disputed issues such as medical insurance and the number of rooms that housekeepers would clean. Although the proposal indicated that it would be withdrawn if any part of it were rejected, it still represented a significant change in circumstances indicating that agreement might be possible. Only a few months before, the Union had floated a trial balloon "non proposal" that eventually evolved into the official "package" proposal. Even if Respondent's proposed adoption of the Aetna policy did not constitute a significant change in position, given the evolution in the Union's position, there was reason to believe that the Union's position might continue to evolve to the point that an agreement could be reached. Consequently, Petitioner is likely to succeed on its claim that any impasse was broken as of March of 2010 and that Respondent violated the Act by unilaterally imposing its favored medical insurance plan and refusing to negotiate with the Union thereafter.

### 7. Withdrawal of Recognition from the Union

Petitioner argues that the decertification petition was tainted because it arose in the context of unremedied ULPs and accordingly, that Respondent unlawfully withdrew recognition from the Union. Respondent argues that the alleged ULPs are "too distant in time" to have impacted the decertification petition and "not of the type to support a finding of taint."

 "[U]nions are entitled to a presumption of majority support after they are certified by the NLRB."[59] "An employer may only withdraw recognition

---

**52.** *NLRB v. Whitesell Corp.,* 638 F.3d 883, 889 (8th Cir.2011) (citing, *inter alia,* 29 U.S.C. § 158(a)(5)).

**53.** *Id.* at 890 (citations omitted).

**54.** *Id.* (quoting *TruServ Corp. v. NLRB,* 254 F.3d 1105, 1114 (D.C.Cir.2001)).

**55.** *Id.* (quoting *TruServ,* 254 F.3d at 1114 (alteration marks omitted)).

**56.** *TruServ,* 254 F.3d at 1114 n. 8 (citing *NLRB v. McClatchy Newspapers, Inc.,* 964 F.2d 1153, 1164 (D.C.Cir.1992) (alteration marks omitted)).

**57.** *McClatchy Newspapers,* 964 F.2d at 1165 (citation omitted).

**58.** *McDermott v. Scott,* No. ED CV 99–153 RT, 1999 WL 734053, at *5 (C.D.Cal. May 27, 1999) (citation omitted).

**59.** *Small v. Avanti Health Sys., LLC,* 661 F.3d 1180, 1194 (9th Cir.2011).

from a union based on 'objective evidence' of a loss of majority support ... and, even then, withdraws recognition 'at its peril.' " [60] At a ULP proceeding, it is the employer's burden "to prove by a preponderance of the evidence that the union had, in fact, lost majority support at the time the employer withdrew recognition." [61] "In any case, 'employers may not withdraw recognition in a context of serious unremedied unfair labor practices tending to cause employees to become disaffected by the union.' " [62] In determining whether ULPs tainted the employees' expression of dissatisfaction with the union, the Board considers four factors:

> (1) the length of time between the unfair practices and the withdrawal of recognition; (2) the nature of the violations, including the possibility for a detrimental or lasting effect on employees; (3) the tendency of the violation to cause employee disaffection; and (4) the effect of the unlawful conduct on employees' morale, organizational activities, and membership in the union. [63]

Here, there were allegedly "serious unremedied unfair labor practices" sufficient to taint the decertification petition. The significance of the ULPs is readily apparent given that 84 percent of the employees had supported the Union boycott in November 2009, only six months before management received the decertification petition. After that point, Respondent disciplined the employees who presented the boycott petition to its general manager, confiscated an employee's Union buttons, and prematurely broke off negotiations with the Union. Furthermore, the ALJ credited testimony indicating that two managers coerced three of the employees into signing the decertification petition. [64] And, most significantly, Respondent discharged four employees in February 2010 for engaging in protected activities. When faced with the threat of a § 10(j) action by Petitioner, Respondent quietly reinstated those employees. Based on the record, it is not clear exactly when the employees were reinstated. [65] It is clear, however, that Respondent did not sufficiently repudiate its prior actions.

This pattern of conduct constituted a continuous series of ULPs from November of 2009 up through May of 2010. The incidents were not so far removed in time from the decertification petition to remove the possibility of taint, were serious in nature because of the consequences to the employees involved, were likely to cause disaffection because they directly affected employees engaging protected Union activities, and were consequently likely to chill Union activities. [66] By May of 2010, the environment was "tainted." [67] Conse-

---

**60.** *Frankl v. HTH Corp.*, 650 F.3d 1334, 1360 (9th Cir.2011) (citations omitted).

**61.** *Id.* (citation omitted).

**62.** *Id.* (citation omitted).

**63.** *E. Bay Auto. Council v. NLRB*, 483 F.3d 628, 634 (9th Cir.2007) (citing *Master Slack Corp.*, 271 N.L.R.B. 78, 84 (1984)).

**64.** Dkt. 6 Ex. 5 at 98.

**65.** *See* Dkt. 58 at 12 (indicating that as of June 11, 2010, Respondent had "committed to making unconditional offers of reinstatement to the four employees").

**66.** Indeed, they included efforts at soliciting the decertification petition itself. *Cf. Narricot Indus., L.P. v. NLRB*, 587 F.3d 654, 665 (4th Cir.2009) (noting that under Board precedent, "where ... the unfair labor practices identified by the Board are directly related to the decertification effort, the Board need not make a specific causation finding under the four-factor *Master Slack* test"), *overruled on other grounds by New Process Steel, L.P. v. NLRB*, —— U.S. ——, 130 S.Ct. 2635, 177 L.Ed.2d 162 (2010).

**67.** Respondent contends that the ALJ wrongfully discounted testimony by many employees providing their own subjective reasons for their dissatisfaction with the Union. Given

quently, the Court finds that Petitioner is likely to succeed on its claim that Respondent impermissibly withdrew recognition from the Union and as a result, unlawfully implemented the Aetna plan and refused to bargain with the Union.

### 8. Failure to Provide Information & Unilateral Changes after Withdrawal of Recognition

Petitioner argues that Respondent violated the NLRA when it failed to provide the Union with previously-requested information concerning the employees and made unilateral changes to its payments to the pension fund, Union access to the Hotel, and consideration of seniority in assigning work. Respondent argues that these actions were permissible because it lawfully withdrew recognition from the Union on July 2, 2011. As discussed above, however, the Court concludes that Petitioner is likely to prevail on its claim that Respondent violated the Act when it withdrew recognition of the Union. Accordingly, Petitioner is also likely to prevail on its contentions that Respondent failed to provide information to the Union and made unilateral changes in violation of the Act after withdrawing recognition from the Union.

### B. Irreparable Harm

Petitioner argues that absent injunctive relief, the employees will suffer irreparable harm in the form of: loss of their free choice of the Union as their bargaining representative, loss of the Union's ability to bargain effectively on their behalf, erosion of their support for the Union, loss of the benefits of collective bargaining, loss of their rights to engage in protected activities, and evisceration of the Board's ability to issue an effective final order. Respondent argues that the employees will not suffer irreparable harm if the parties wait for the Board to issue a decision because a substantial amount of time has already passed since the alleged violations.

In order to obtain relief under § 10(j), a regional director must demonstrate that irreparable harm is "likely," as opposed to merely "possible." [68] Notably, that does not require showing that the harm "is certain or even nearly certain." [69] The Ninth Circuit has repeatedly held that "permitting an alleged unfair labor practice to reach fruition and thereby rendering meaningless the Board's remedial authority *is* irreparable harm." [70] "[W]hile a district court may not presume irreparable injury with regard to likely unfair labor practices generally, irreparable injury is established if a likely unfair labor practice is shown along with a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief." [71]

In *Small v. Avanti Health Sys., LLC*,[72] the Ninth Circuit set forth several reasons why the "[f]ailure to bargain in good faith has long been understood as likely causing an irreparable injury to union representation." First, without bargaining, employees cannot achieve the benefits of a

---

that the employees had also supported the Union boycott six months earlier, Respondent's argument that the dissatisfaction was completely unrelated to the alleged ULPs is unpersuasive.

**68.** *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191 (9th Cir.2011) (citing *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)).

**69.** *Id.*

**70.** *Id.* (quoting *Frankl v. HTH Corp.*, 650 F.3d 1334, 1362 (9th Cir.2011) (alterations omitted; emphasis original)).

**71.** *Frankl*, 650 F.3d at 1362.

**72.** 661 F.3d 1180, 1191–95 (9th Cir.2011) (quoting, inter alia, *Frankl*, 650 F.3d at 1362 (alteration omitted)).

collective bargaining agreement.[73] "Second, unions provide a range of non-economic benefits to employees"—such as greater job security—"that are not realized when an employer refuses to bargain with the union." [74] Third, an employer's "failure to bargain in good faith threatens industrial peace," in contravention of the "overriding policy of the NLRA." [75] Fourth, a delay in bargaining weakens support for the union ... as the benefits of unionization are lost and the spark to organize is extinguished." [76] These harms generally cannot be remedied by the Board through a "forward-looking order" as they are difficult to measure "in dollar terms" and, regardless, the Board "generally does not order retroactive relief." [77] Thus, "a failure to bargain at all is likely to cause irreparable harm 'absent some unusual circumstance indicating that union support is not being affected or that bargaining could resume without detriment as easily later as now.' " [78] Moreover, "the discharge of active and open union supporters risks a serious adverse impact on employee interest in unionization and can create irreparable harm to the collective bargaining process." [79]

A regional director's delay in filing a petition for relief under § 10(j) may or may not undermine claims of irreparable harm depending on whether "the harm has occurred and the parties cannot be returned to the status quo or if the board's final order is likely to be as effective as an order for interim relief." [80] Ninth Circuit law is not a model of clarity in terms of how this standard should be applied. In *McDermott v. Ampersand Publ'g, LLC,*[81] decided in 2010, the court affirmed a district court's decision denying a § 10(j) petition, noting that the regional director did not seek relief until "some 13 to 17 months" after the alleged ULPs took place. The following year, however, in *Small v. Avanti Health Sys., LLC,*[82] and *Frankl v. HTH Corp.,*[83] the Ninth Circuit affirmed two district court decisions granting § 10(j) petitions despite similar (or longer) delays. In both decisions, the court distinguished *Ampersand,* noting that it involved First Amendment considerations as the employer in that case was a newspaper.[84] Although *Ampersand* did involve a "heightened" First Amendment standard, the court did not discuss the First Amendment issues in evaluating the regional director's delay.[85] One significant distinguishing factor, however, is that in *Ampersand,* the district court denied the petition, while in the latter two cases, the district courts had granted the petitions.[86] This makes sense given that the courts of appeals review district court decisions on § 10(j) petitions for abuse of discretion.

---

73. *Id.* at 1191 (citing *Frankl,* 650 F.3d at 1363).

74. *Id.* at 1192.

75. *Id.*

76. *Id.* (citing *Frankl,* 650 F.3d at 1362–63).

77. *Id.* at 1191–92 (citations omitted).

78. *Id.* at 1194 (citing *Frankl v. HTH Corp.,* 650 F.3d 1334, 1363 (9th Cir.2011)).

79. *Frankl,* 650 F.3d at 1363 (citations omitted).

80. *Small v. Avanti Health Sys., LLC,* 661 F.3d 1180, 1195 n. 20 (9th Cir.2011) (citing *McDermott v. Ampersand Publ'g, LLC,* 593 F.3d 950, 965 (9th Cir.2010)).

81. 593 F.3d 950, 965 (9th Cir.2010).

82. 661 F.3d 1180, 1195 n. 20 (9th Cir.2011).

83. 650 F.3d 1334, 1363 (9th Cir.2011).

84. *Avanti,* 661 F.3d at 1195 n. 20; *Frankl,* 650 F.3d at 1363–65.

85. 593 F.3d at 965.

86. *See Avanti,* 661 F.3d at 1195 n. 20.

Additionally, *Avanti* and *Frankl* both involved an employer's failure to bargain good faith, which the court found was more susceptible to an immediate remedy than retroactive relief from the Board, while *Ampersand* primarily involved a dispute over the reinstatement of employees.[87] Thus, in circumstances similar to the present case, even a three year delay may be permissible where the ULP can be remedied in such a manner that could not be achieved retroactively by the Board's order.[88]

Moreover, a regional director's delay by awaiting an ALJ's decision may aid the process by providing the district court with the benefit of a developed record and the ALJ's legal analysis.[89] Indeed, there are good policy reasons for permitting regional directors to go through the initial stages of the NLRB process first rather than requiring them to immediately turn to the courts. This preserves the NLRB's role as the "expert" in labor issues, giving the NLRB's "first-level decisionmaker"[90] a chance to make the initial factual findings and develop the record. Otherwise, district courts would take that place on an abbreviated schedule, which might then unduly influence the ALJ's recommendation.

■ In this case, the violations are of the type that the Ninth Circuit has repeatedly recognized cause irreparable harm. Because of those actions, the employees have been deprived of the benefits of collective bargaining and four employ-ees were discharged for engaging in Union activities without a formal repudiation. It appears that this conduct has already had a deleterious impact on support for the Union. The passage of additional time is likely to exacerbate these harms. Although a significant period of time has passed since the alleged LLPs took place, the delay is not so long so as to render any injunctive relief ineffectual at this point. Accordingly, the Court concludes that irreparable harm is likely absent an injunction.

### C. Balancing of the Equities

Petitioner argues that the equities favor injunctive relief because it is necessary to restore the Union's support and the employees' collective bargaining rights, while imposing relatively minor burdens on Respondent. Respondent argues that the equities tip against injunctive relief because all parties will potentially suffer if the Court orders injunctive relief and the Board subsequently rules in Respondent's favor.

■ When balancing the equities, a "district court must take into account the probability that declining to issue the injunction will permit the alleged unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority."[91] Where ULPs cause a union's support to wane to a "limited" level, the union may be "unable to bargain effectively regardless of the ultimate relief granted by the Board."[92] Notably, an or-

---

**87.** *Id.*

**88.** *Id.*

**89.** *Frankl v. HTH Corp.,* 650 F.3d 1334, 1363 (9th Cir.2011).

**90.** *Small v. Avanti Health Sys., LLC,* 661 F.3d 1180, 1186 (9th Cir.2011) (quoting *Bloedorn v. Francisco Foods, Inc.,* 276 F.3d 270, 288 (7th Cir.2001)).

**91.** *Avanti,* 661 F.3d at 1196 (citing *Frankl,* 650 F.3d at 1365).

**92.** *Scott v. Stephen Dunn & Assocs.,* 241 F.3d 652, 667 (9th Cir.2001), *abrogated on other grounds by Winter v. Natural Res. Def. Council,* 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

der to bargain in good faith imposes a "minimal" burden on an employer.[93] Moreover, "courts generally are skeptical about an employer's claimed 'benevolence as its workers' champion against their certified union.'"[94]

■ Under the circumstances here, the equities favor injunctive relief. The passage of additional time will only increase the probability that the Union will be unable to recover at the Hotel and increase the period of time that the employees will be deprived of the benefits of collective bargaining. The Court has found that Petitioner is likely to succeed on the merits, and the burdens imposed on Respondent by an injunction will be relatively minimal here.

### D. Public Interest

Petitioner argues that injunctive relief is in the public interest because it will protect the integrity of the bargaining process, provide the Union with the opportunity to engage in meaningful bargaining, and preserve the Board's remedial power. Respondent argues that the public interest favors leaving these issues to the administrative expertise of the Board.

■ "In § 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge."[95] "Very often, the most effective way" for a district court to pre-serve the Board's ability to "recreate the conditions and relationships that would have been had there been no unfair labor practice[s]" is to itself, "order a return to the status quo."[96]

■ The public interest favors injunctive relief here. Petitioner is correct that the Board is the expert on labor issues; however, Congress has recognized that § 10(j) relief is necessary in some situations because the Board's processes may take so long that they eviscerate the Board's ability to effectively remedy ULPs. Deference to the Board's expertise does not counsel against preserving its ability to render meaningful relief. Otherwise, § 10(j) relief would never be appropriate.

### E. Remedy

Petitioner contends that the employees are likely to suffer irreparable harm unless the Court orders Respondent to recognize the Union, bargain with the Union, abandon its unilateral changes, and provide the Union with the information it needs to engage in bargaining. Accordingly, Petitioner has submitted a broad Proposed Order[97] effectuating these remedies, similar to the ALJ's recommended order.[98] Respondent suggests that its handbook rules should not be enjoined because they represent the longstanding status quo.[99]

■ A district court must narrowly tailor a preliminary injunction to address the particular harms at issue.[100] "An over-

93. *Avanti,* 661 F.3d at 1196 (citation omitted).

94. *Frankl,* 650 F.3d at 1365 (citations omitted).

95. *Small v. Avanti Health Sys., LLC,* 661 F.3d 1180, 1197 (9th Cir.2011) (citing *Frankl v. HTH Corp.,* 650 F.3d 1334, 1365 (9th Cir. 2011)).

96. *Frankl,* 650 F.3d at 1366 (citations omitted).

97. Dkt. 1–1.

98. Dkt. 6 Ex. 5 at 106–10

99. Respondent has also notes that it entered into a settlement agreement with the pension fund; however, as the Court understands Petitioner's position, it is not seeking any injunctive relief with respect to the pension fund.

100. *See Stormans, Inc. v. Selecky,* 586 F.3d 1109, 1140 (9th Cir.2009) ("Injunctive relief must be tailored to remedy the specific harm alleged." (citation and ellipsis omitted)); *see also id.* at 1142.

broad injunction is an abuse of discretion."[101] Here, the Court has found that Petitioner is entitled to injunctive relief. Much of the relief outlined in Petitioner's Proposed Order is appropriate; however, some of it—while potentially appropriate for a final order from the Board—goes beyond what is necessary at this point to preserve the Board's ability to render meaningful relief. Consequently, the Court has modified certain aspects of the Proposed Order. In particular, Respondent raises a cogent point with respect to the handbook rules. Consequently, rather than precluding Respondent from maintaining or enforcing the relevant rules at all, the Court will grant the narrower remedy of enjoining Respondent from enforcing the rules in such a manner so as to preclude the employees from exercising their rights under NLRA § 7.

## V. CONCLUSION

For the foregoing reasons, the Petitioner Richard Ahearn's Petition for Injunctive Relief pursuant to § 10(j) of the National Labor Relations Act (Docket No. 1) is GRANTED.

IT IS HEREBY ORDERED that, pending the final disposition by the National Labor Relations Board of the matters involving the Parties to this action now pending before it, Respondent Remington Lodging and Hospitality, LLC, d/b/a/ the Sheraton Anchorage, its officers, and agents, are:

1. Enjoined and restrained from:
 a. Unilaterally assigning non-bargaining unit work to bargaining unit employees;
 b. Failing to notify the Federal Mediation and Conciliation Service of the existence of a contract dispute with the Union and providing 30 days' notice prior to making unilateral changes in its employees' terms and conditions of employment;
 c. Enforcing the employee handbook rules set forth on page 4 of this Order so as to preclude its employees from exercising their rights under § 7 of the NLRA, including their rights to present petitions to management, distribute handbills at the entrances of Respondent's Hotel, and disclosing information about the terms and conditions of their employment to the media or others;
 d. Disciplining, suspending, or discharging any employees within the bargaining unit for engaging in Union activities protected by § 7 of the NLRA;
 e. Confiscating pro-Union buttons being worn and carried by employees;
 f. Prematurely declaring any impasse in collective bargaining negotiations with the Union;
 g. Failing to continue negotiating with the Union after prematurely declaring an impasse in bargaining;
 h. Coercing employees (including through threats, promises of favorable treatment, or interrogation) into signing a petition seeking to decertify the Union as the collective bargaining representative of the bargaining unit employees;
 i. Denigrating the Union in the eyes of bargaining unit employees by informing them that the Respondent intends to unilaterally implement certain changes in their terms and conditions of employment, specifically including their medical insurance benefits, without the parties having first reached a good faith collective bargaining impasse;

---

101. *Id.* (citation omitted).

j. Withdrawing recognition from the Union without possessing untainted objective evidence of loss of the Union's majority status;

k. Refusing to provide the Union with an updated employee roster;

l. Making unlawful unilateral changes in its employees' terms and conditions of employment, including by changing the medical insurance plan, banning the Union and its representatives from Respondent's facility, failing to follow Respondent's seniority scheduling provisions, and eliminating its bargaining unit employees' pension plan; and

m. In any like or related manner, interfering with, restraining or coercing its employees in the exercise of their rights under § 7 of the NLRA; and

2. Directed to:

a. At the request of the Union, rescind the unilateral changes made in its employees' terms and conditions of employment implemented on or about mid-October 2009, including: increasing the number of rooms its housekeepers are expected to clean, ceasing to pay for meal breaks, and imposing a fee on employee purchases in the cafeteria;

b. At the request of the Union, rescind the unilateral changes made in its employees' terms and conditions of employment implemented on or about May 1, 2010, specifically including the institution of a new Aetna medical insurance plan, reinstate the medical insurance plan provided for in the expired collective bargaining agreement, and commence payments on behalf of its employees to the medical insurance carrier under that plan;

c. Recognize the Union as the collective bargaining representative of the bargaining unit employees;

d. At the request of the Union, resume negotiating with the Union for a reasonable period of time, in a good faith effort to reach agreement on the terms of a successor collective bargaining agreement, reinstate all tentative agreements previously reached by the parties during their negotiations, and, if an overall agreement is reached, embody it in a signed document;

e. Within 20 days of this Order, provide the Union with an updated employee roster (including each bargaining unit employee's first name, last name, date of hire, date of birth, job classification, address, and phone number);

f. At the request of the Union, rescind the unilateral changes made in its employees' terms and conditions of employment implemented in or about July 2010, including: banning the Union and its representatives from Respondent's facility and failing to follow seniority scheduling practices;

g. Post copies of this Order (in English immediately, and in Spanish within 20 days), at all locations where notices from Respondent to employees are customarily posted; maintain such notices free from all obstructions or defacements pending the Board's administrative proceeding; and grant to agents of the Board reasonable access to Respondent's facility to monitor compliance with this posting requirement;

h. Within 20 days after entry of this Order, hold a mandatory meeting or meetings for employees, scheduled to ensure the widest possible at-

tendance during regular business hours and on Respondent's premises, at which pages 30 through 34 of this Order is to be read in English and Spanish to the employees by a responsible management official or, at Respondent's option, a Board Agent in a responsible official's presence; and

i. Within 30 days of the issuance of this Order, file a sworn affidavit from a responsible Respondent official which describes with specificity how Respondent has complied with the terms of this Order, including the exact locations where Respondent posted the materials required under this Order and where and when the Order was read to the employees.