**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-2331**

LISA Y. HENDERSON, Acting Regional Director of the Tenth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board; NATIONAL LABOR RELATIONS BOARD,

            Plaintiffs - Appellants,

v.

BLUEFIELD HOSPITAL CO., LLC, d/b/a Bluefield Regional Medical Center,

            Defendant - Appellee.

**No. 16-2332**

LISA Y. HENDERSON, Acting Regional Director of the Tenth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board; NATIONAL LABOR RELATIONS BOARD,

            Plaintiffs - Appellants,

v.

GREENBRIER VMC, LLC, doing business as Greenbrier Valley Medical Center,

            Defendant - Appellee.

Appeals from the United States District Court for the Southern District of West Virginia, at Bluefield and Beckley.  David A. Faber, Senior District Judge.  (1:16-cv-06305; 5:16-CV-06307)

Argued: October 25, 2017                    Decided: August 28, 2018

---

Before GREGORY, Chief Judge, and NIEMEYER and AGEE, Circuit Judges.

---

Affirmed by published opinion. Judge Niemeyer wrote the majority opinion, in which Judge Agee joined. Chief Judge Gregory wrote a dissenting opinion.

---

**ARGUED:** Jeffrey William Burritt, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Appellants. Kaitlin Ann Kaseta, CARMODY & CARMODY, LLP, Mount Pleasant, South Carolina, for Appellees. **ON BRIEF:** Richard F. Griffin, Jr., General Counsel, Jennifer Abruzzo, Deputy General Counsel, Barry J. Kearney, Associate General Counsel, Jayme L. Sophir, Deputy Associate General Counsel, Elinor L. Merberg, Assistant General Counsel, Laura T. Vazquez, Deputy Assistant General Counsel, Meghan Brooke Phillips, Office of the General Counsel, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Appellants. Bryan T. Carmody, CARMODY & CARMODY, LLP, Mount Pleasant, South Carolina, for Appellees.

---

NIEMEYER, Circuit Judge:

The issue in this appeal is whether the district court abused its discretion in declining to grant preliminary injunctive relief under § 10(j) of the National Labor Relations Act as requested to preserve the ability of the National Labor Relations Board ("the Board") to award relief after the completion of the ongoing agency process adjudicating unfair labor practice charges against two hospitals. We conclude that the Board failed to demonstrate sufficiently that the effectiveness of its remedial power was in jeopardy in this case and therefore that the district court did not abuse its discretion in denying the Board's petitions for injunctive relief.

I

Bluefield Regional Medical Center is an acute-care hospital located in Bluefield, West Virginia, that employs 170 registered nurses. Greenbrier Valley Medical Center likewise is an acute-care hospital located in Ronceverte, West Virginia, that employs 120 registered nurses. These hospitals are affiliated with Community Health Systems, Inc., which has a national network of affiliated hospitals.

In August 2012, the registered nurses at both hospitals voted to be represented for purposes of collective bargaining by the National Nurses Organization Committee ("the Union"), and thereafter the Board certified the Union as the exclusive bargaining representative for each hospital's "full-time, regular part-time, and per diem Registered Nurses." Both hospitals challenged the certifications and refused to bargain with the Union, prompting the Union to file unfair labor practice charges with the Board under § 8

3

of the National Labor Relations Act ("the NLRA").  In December 2014, the Board issued a consolidated order directing the hospitals to recognize and bargain with the Union.

Bluefield began bargaining sessions with the Union in March 2015, and sessions continued into November 2015.  At a November session, Bluefield presented the Union with a "package proposal" that lacked a grievance-arbitration provision and contained a broad management-rights clause that, among other things, reserved the hospital's right to unilaterally discharge, suspend, or discipline any registered nurse.  Michelle Mahon, the Union's bargaining representative, rejected the package as "completely unacceptable" and "demonstrative of bad faith bargaining."  But, according to Mahon, she nonetheless "made it clear" that the Union still wanted "to bargain in good faith," and she proposed several alternative provisions.  The hospital's bargaining representative, however, stated that Bluefield was "standing with its proposal" and would not respond to the Union's proposals because the Union had not responded to its package proposal as a whole. Negotiations thereafter broke down.

Similarly, Greenbrier Valley began bargaining sessions with the Union in February 2015, and sessions continued into October 2015, when Greenbrier Valley presented a package proposal to the Union that was essentially the same as the one presented by Bluefield.  And similarly, that proposal led to a breakdown in negotiations.

In addition, after Greenbrier Valley terminated a registered nurse's employment during the summer of 2015 on the ground that she had violated the hospital's attendance policy, the Union requested to bargain over the nurse's discharge and also requested that the hospital provide the Union with the nurse's attendance records and the attendance

4

records for other nurses in her department. Greenbrier Valley stated that it was willing to bargain with the Union over the nurse's discharge and to provide the requested information but only if the Union first provided the hospital with "a suitable indemnification." Greenbrier Valley explained that, earlier in the year, an Ohio jury had returned an $800,000 verdict against Affinity Medical Center, another Community Health Systems hospital, on an employee's defamation claim, which, according to Greenbrier Valley, arose "in material part . . . out of Affinity's inclusion of a [Union] representative . . . in an investigatory interview." Nonetheless, the Union, emphasizing that "defamation is an *intentional* tort," rejected the request for an indemnification agreement, calling it "absurd" and the "latest assault on the fundamental . . . rights of Registered Nurses."

In January 2016, the Union filed unfair labor practice charges with the Board against both Bluefield and Greenbrier Valley under § 8(a)(1) and (5) of the NLRA, alleging that both hospitals had "unlawfully engag[ed] in surface bargaining" and had therefore "failed and refused to bargain collectively and in good faith with the [Union]." In addition, the Union charged Greenbrier Valley with bad-faith bargaining with respect to the nurse's discharge. Based on these charges, the Board issued an administrative complaint against the hospitals on March 10, 2016, commencing a process of agency adjudication that remains ongoing.

Then, roughly six months after the Union filed its charges with the Board, the Board filed petitions in the district court — one against each hospital — under § 10(j) of the NLRA, 29 U.S.C. § 160(j), requesting preliminary injunctions "pending the final

5

disposition of [the] matters involved herein pending before the Board" that would direct the hospitals to bargain with the Union in good faith; require the hospitals to post copies of the court's preliminary injunction; and require the hospitals to read the preliminary injunction orally to the employees. The Board alleged that unless the injunctions issued, the registered nurses would be deprived "of their fundamental right to be represented for the purposes of collective bargaining." In addition, the Board sought a preliminary injunction that would direct Greenbrier to bargain in good faith over the former nurse's discharge and to furnish the Union with the requested information.

In support of the petitions, the Board filed affidavits from Union employee Michelle Mahon and various nurses, including Bluefield Nurse Brenda Meadwell and Greenbrier Valley Nurse Michelle O'Bryan. According to Mahon and Nurse Meadwell, the hospitals' negotiator frequently yelled or screamed at the Union's bargaining-team members and once threw papers toward Mahon. They also stated that some scheduled bargaining sessions were cancelled because the hospitals refused to grant bargaining-team members time off to attend the sessions.

With respect to the effect of the stalled negotiations on the employees' perception of the Union, Nurse O'Bryan stated that "[o]ver the last six months, things have died down with the [U]nion." She added:

> We've been trying to negotiate forever. A lot of people are thinking, if it is going to work, it is. If it's not, it's not. In general conversation, people might say things like, "well, the [U]nion ain't done nothing." When this has come up, I'll explain that this is going to court and that it takes awhile . . . . Because a lot of the nurses aren't seeing anything, they aren't really talking about the [U]nion.

6

She stated that she had told employees that "the Union has filed charges against the hospital about things, and now we're just waiting. You know how long courts take." She noted that there had been a lot of information passed out by the Union in earlier times, but that she had not "seen any flyers in the break room about the [U]nion in a while" and that "the [U]nion reps [used to be] more visible at the hospital." She did acknowledge that she was not aware of any anti-union effort, that the Union had continued having some meetings, and that nurses continued to wear Union buttons. Finally, Nurse O'Bryan stated that a number of nurses had "left over the last few years" and were replaced by licensed practical nurses, who were not part of the bargaining unit. She herself stated that she was about to change from full-time to part-time status because "nothing stays the same, there's changes made whenever the managers want to and it is hard to work that way." She also added that she had found a better paying job that was closer to her home.

On the same subject, Nurse Meadwell noted that the Union had called a "National Day of Action" on June 1, 2016, to raise awareness regarding its activities at several Community Health Systems hospitals and that, in connection with this event, she had talked to reporters from the local TV station and newspaper. She stated that she had asked three or four other registered nurses to join her but that they had said that they did not "want to participate because they were afraid they would be fired." She acknowledged that the nurses continued to have Union meetings "occasionally" and that the Union had done outreach at the hospital by talking to nurses and handing out papers.

At a hearing on the petitions before the district court in September 2016, counsel for both the Board and the hospitals represented to the court that bargaining sessions between the Union and the hospitals had resumed.

After the parties' briefing and oral arguments, the district court denied the Board's petitions for preliminary injunctive relief, without prejudice, by an order and memorandum opinion dated September 20, 2016. In its memorandum opinion, the court noted that "§ 10(j) relief is extraordinary" and that the statutory provision "only authorizes interim injunctive relief reasonably necessary to preserve the ultimate remedial power of the Board." *Henderson v. Bluefield Hosp. Co.*, 208 F. Supp. 3d 763, 766 (S.D. W. Va. 2016) (internal quotation marks omitted) (quoting *Muffley ex rel. NLRB v. Spartan Mining Co.*, 570 F.3d 534, 545 (4th Cir. 2009)). Applying *Winter v. National Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008), the court concluded that the Board failed to demonstrate, as one of the requirements necessary to obtain preliminary injunctive relief, that there was a likelihood of irreparable injury to the Board's ability to remedy the alleged unfair labor practices in the absence of an injunction, and it therefore denied the Board's petitions.

Addressing the Board's theory that preliminary injunctive relief was necessary to prevent declining employee support for the Union, the court concluded that the Board had not demonstrated that employee support for the Union was "likely to wane," pointing to record evidence showing that "several registered nurses (RNs) [had] shown consistent commitment to the Union" and also reasoning that "the assertive posture that the Union [had been] tak[ing] to represent the RNs . . . , particularly by filing numerous unfair labor

8

practice charges on the nurses' behalf, indicate[d] that the employees probably [would] not perceive the Union as weak and [would] not vote with their feet by leaving it." *Henderson*, 208 F. Supp. 3d at 771.

Moreover, with respect to the irreparability of injury, the court found that adequate remedies would be available from the Board at the conclusion of the administrative proceedings. Rejecting the general proposition that employees suffer irreparable harm "whenever [they] could be without the nonmonetary benefits of collective bargaining while awaiting the Board's actions," *Henderson*, 208 F. Supp. 3d at 774 (quoting *McKinney ex rel. NLRB v. Southern Bakeries, LLC*, 786 F.3d 1119, 1125 (8th Cir. 2015)), the court concluded that the surface bargaining allegedly committed by the hospitals did not "raise any . . . extraordinary circumstances," *id*. While the court acknowledged that, with the passage of time, some registered nurses could retire or seek employment elsewhere, it reasoned that this did not "justify a remedy that is extraordinary since these kinds of changes exist in all manner of contentious cases." *Id*.

At bottom, the court recognized that the Board's remedial powers in the ongoing agency proceedings were not at risk and in need of protection by § 10(j) injunctive relief.

From the district court's order dated September 20, 2016, denying the Board's petitions for a preliminary injunction, the Board filed these appeals.

## II

The Board advances three main arguments in challenging the district court's order denying its § 10(j) petitions. It argues *first* that the district court erred by analyzing only

the irreparable-harm factor for granting a preliminary injunction; *second*, that "[t]he court erred in refusing to infer harm from the nature of the violations the Hospitals committed"; and *third*, that the court "committed clear error" in its findings rejecting any substantial erosion of employee support for the Union.  We address these arguments in order.

A

While recognizing that, to obtain a § 10(j) injunction, it "must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in the Board's favor, and (4) that an injunction is in the public interest," as established in *Winter*, the Board nonetheless contends that the district court legally erred in relying on *only* the irreparable harm factor. It maintains "that all four [*Winter*] factors and their impact upon one another must be considered," because, according to the Board, "it was impossible for the court to completely assess the irreparable harm without, for instance, assessing the [Board's] likelihood of success, which would have required it to examine the nature of the violations at issue."  Accordingly, the Board asserts that before denying *any* petition for a preliminary injunction, a district court must first consider "all four equitable factors and their interrelatedness."

This argument, however, is foreclosed by our decision in *Muffley* and by the Supreme Court's decision in *Winter*.

Unless Congress specifies otherwise, when courts consider granting injunctive relief under a statute, they exercise their "traditional equitable discretion."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 319 (1982).  Applying that principle in *Muffley*, we held

10

that the "traditional four-part test for equitable relief" applies to petitions under § 10(j). *Muffley*, 570 F.3d at 542.[*] The concededly applicable four-part test articulated in *Winter* requires that the Board demonstrate that (1) it is "likely to succeed on the merits"; (2) "irreparable harm" is "likely" "in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest." 555 U.S. at 20. *Winter* made clear that *each* of these four factors must be satisfied to obtain preliminary injunctive relief. *See id.* And, even more relevant to the Board's argument here, the Court indicated that it was unnecessary to address all four factors when one or more had not been satisfied. Indeed, it concluded in the circumstances before it that "[a] proper consideration of [the balance of equities and the public interest] *alone* require[d] denial of the requested injunctive relief," *id.* at 23 (emphasis added), and it therefore did "not address the lower courts' holding that plaintiffs have also established a likelihood of success on the merits," nor did it resolve whether the plaintiffs had established irreparable injury, *id.* at 23–24. In light of *Winter*, the Board's argument that district courts must

---

[*] While *Muffley* applied the traditional four-part test for preliminary injunctive relief articulated in *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Manufacturing Co.*, 550 F.2d 189 (4th Cir. 1977), which balanced various factors and, in certain circumstances, allowed a preliminary injunction to issue based on a showing of "a '*possible*' irreparable injury," *id.* at 196 (emphasis added), the Supreme Court in *Winter* held that a "possibility of irreparable injury" factor was "too lenient" for preliminary equitable relief, 555 U.S. at 22, thus abrogating the *Blackwelder* test. Instead, *Winter* requires a *likelihood* of irreparable injury, a higher standard. *Id.* at 21; *see also Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346–47 (4th Cir. 2009) (recognizing that "[o]ur *Blackwelder* standard . . . stands in fatal tension with the Supreme Court's 2008 decision in *Winter*"), *vacated and remanded on other grounds*, 559 U.S. 1089 (2010), *reinstated in relevant part*, 607 F.3d 355 (4th Cir. 2010) (per curiam).

11

consider "all four factors and their impact upon one another" before denying preliminary injunctive relief is clearly misplaced.

The Board maintains nonetheless that, "[i]n the §10(j) context[,] courts cannot achieve a full understanding of the relevant irreparable harms without considering the type and strength of the violation involved and the statutory rights that the violation impacts." It is true that § 10(j) requires application of the *Winter* factors to the statutory provision's underlying purpose — namely, "preserving the Board's remedial power pending the outcome of its administrative proceedings." *Muffley*, 570 F.3d at 543. But nothing in that purpose suggests that a district court must mechanically consider all four *Winter* factors if one is clearly absent. Moreover, just because the district court found it unnecessary to reach more than one factor, it does not follow that the court failed to consider the nature of the alleged violation and "the statutory rights that the violation impacts." Indeed, the district court's thorough opinion amply demonstrates that it was fully aware of the Board's allegations that the hospitals had bargained in bad faith, and it took the nature of the hospitals' alleged violations into account in analyzing the irreparable-harm factor, even though it did not determine whether the Board was likely to show that the violations had in fact occurred.

In sum, the district court correctly applied the *Winter* factors and, upon finding that one had not been satisfied, concluded that the Board could not establish the necessary criteria for preliminary injunctive relief.

12

B

The Board next argues that the district court erred in failing to recognize that irreparable harm is "inherent in bad-faith bargaining cases," presenting three theories as to why the court should have "inferred irreparable harm from the very nature of the violation." *First*, it maintains that, "[a]bsent an injunction, the Hospitals' unlawful conduct is likely to cause the Union to lose its 'prestige and legitimacy' in unit employees' eyes and appear completely ineffective." "By the time the Board issues its final order," it asserts, "the Union will no longer have the support of the employees" and will therefore "be unable to bargain effectively under a Board order." *Second*, it claims that "the Hospitals' surface bargaining also irreparably deprives employees of the benefits of collective bargaining," including both the monetary and non-monetary benefits that employees could expect to receive under a collective-bargaining agreement if the hospitals were required to negotiate in good faith. And *third*, it argues that "[t]he absence of good-faith bargaining . . . causes a public harm that threatens the very core purpose of the Act and is, in itself, the type of harm that § 10(j) was intended to prevent."

There is, however, a fundamental tension between the Board's theories of inherent harm and the Supreme Court's recognition that "[a] preliminary injunction is an extraordinary remedy *never awarded as of right*," *Winter*, 555 U.S. at 24 (emphasis added), as well as our own recognition that § 10(j) relief similarly should be "*extraordinary*," *Muffley*, 570 F.3d at 545 (emphasis added). While there may well be circumstances where the likelihood of irreparable injury can be established by the same evidence indicating that the Board is likely to prove a statutory violation, *see, e.g.,*

13

*Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 297–98 (7th Cir. 2001), we conclude that, as a general proposition, an employer's alleged failure to bargain in good faith with a union regarding an initial collective bargaining agreement is not the kind of violation from which likely irreparable harm can be *inferred*. The Board has the burden of showing "that in the absence of a preliminary injunction," the Union and the employees it seeks to represent are "*likely* to suffer *irreparable* harm before a decision on the merits can be reached," *Winter*, 555 U.S. at 22 (emphasis added) (internal quotation marks and citation omitted), and, in particular, that "interim injunctive relief [is] reasonably necessary to preserve" the Board's "ultimate remedial power" and *will not "be a substitute for the exercise of that power*," *Muffley*, 570 F.3d at 545 (emphasis added) (quoting *Schaub ex rel. NLRB v. Detroit Newspaper Agency*, 154 F.3d 276, 279 (6th Cir. 1998)). The Board's theories of the harm inherent in the alleged surface bargaining are not only too speculative and categorical, but they also fail to demonstrate why the Board's own relief given at the conclusion of the agency process cannot address the violations.

The Board's first theory that interim relief is necessary to prevent the Union from losing employee support may not be flawed in the abstract, but it fails in the circumstances of this case. It may well be that some employees feel frustrated by the lack of progress to date, but we cannot simply infer that, by the time the Board completes the agency process, support for the Union will have collapsed to the point where the Union would be unable to negotiate effectively under a remedial order issued by the Board. The Union and those employees who support the Union remain free to tell the

registered nurses that the hospitals have been stonewalling and that the Board is pursuing legal action on the Union's behalf, as the record indeed reflects. At bottom, it is far from inevitable or even likely that persisting employee frustrations will undermine the ability of the Board to award appropriate relief. *Cf. Muffley*, 570 F.3d at 544 (noting, in a case where an ALJ had found that the employer had systematically refused to hire union members, that abundant evidence showed "that, without some measure of preliminary relief, many of the victims of the alleged discrimination would either retire or move away in search of other employment" and therefore concluding that, "*[i]n such a situation*, even a well-established union . . . might well lose support over time, such that when the Board does issue its order, it might be impossible for the union to reconstitute" (emphasis added)).

The Board also contends that a preliminary injunction is warranted because "the Hospitals' violations are . . . irreparably depriving employees of the benefits of collective bargaining." This theory, however, rests on the assumption that if the district court were to order the hospitals to negotiate in good faith, the hospitals and the Union would be likely to negotiate successfully an initial collective bargaining agreement *before* the Board resolves the administrative complaint. That is the only scenario under which an interim court order requiring the hospitals to bargain in good faith could have *any* impact on the ability of employees to start enjoying the fruits of a collective bargaining agreement. But the Board has given us *no* reason to assume that the hospitals and the Union would be likely to complete the complicated process of negotiating an initial collective bargaining agreement before the Board can enter its own final order in the

15

underlying administrative proceedings. *See McKinney*, 786 F.3d at 1125 ("It would be contrary to our precedent to find irreparable harm whenever employees could be without the nonmonetary benefits of collective bargaining while awaiting the Board's action").

Finally, the Board contends that Congress has "recognized that a party's failure to bargain in good faith is a public harm" and that, "[a]s such, the absence of good-faith bargaining in and of itself constitutes a significant and, over time, irreparable harm" justifying interim relief under § 10(j). But this argument also falls wide of the mark. While Congress has assuredly decided that the public's interest is best served by requiring employers to negotiate in good faith with duly constituted unions, it does not follow that, absent § 10(j) relief, the public's interest in industrial peace is likely to be irreparably harmed during the time it takes to complete the administrative process before the Board. Indeed, Congress specifically addressed this public interest in creating that administrative process, reserving § 10(j) relief from the courts for only extraordinary circumstances.

At bottom, the Board's position amounts to an argument that whenever it has established that it is likely to succeed on the merits of a complaint alleging that an employer has engaged in bad-faith bargaining, it has necessarily established that irreparable harm is likely in the absence of a preliminary injunction. But that proves too much. Perhaps recognizing this fallacy, the Board attempts to reassure us that "recognizing [irreparable] harm [as] inherent in bad-faith bargaining cases [will] not make § 10(j) relief commonplace" because "*the Board* does not seek injunctive relief in the vast majority of cases." (Emphasis added). But this ignores the role that Congress

16

has assigned to *the district court* in the first instance to assess whether interim relief would be "just and proper," 29 U.S.C. § 160(j), an analysis properly governed by *Winter*'s four factors and the recognition that preliminary injunctive relief under § 10(j) is an "extraordinary" remedy appropriate only to "preserv[e] the Board's remedial power pending the outcome of its administrative proceedings," *Muffley*, 570 F.3d at 543, 545.

C

Finally, the Board contends that the district court "committed clear error" in its evaluation of the record evidence, arguing that the record "show[s] a decrease in employee confidence in the Union, employee willingness to participate in Union activities, and the Union's level of employee support." The evidence, however, was far from as one-sided as the Board suggests and, in any event, falls short of showing a threat to the Board's remedial power. While there was some evidence — particularly in Greenbrier Valley Nurse O'Bryan's affidavit — that some registered nurses had expressed "frustrat[ion] with the fact that it's taking so long to get a contract," there was also ample evidence demonstrating efforts by the Union's supporters to counteract that sentiment, as the district court noted. Thus, it is far from clear on the present record that, absent interim injunctive relief, employee support for the Union would likely decline to a point where the Union would be unable to negotiate effectively should the Board ultimately issue a bargaining order and afford other relief. Nurse O'Bryan also stated that "a lot of the RNs are gone" and expressed her view that the hospital was hiring non-bargaining unit licensed practical nurses to take their place in an effort to undercut the Union. But there was *no* evidence that registered nurses were leaving the hospital

17

*because* of Greenbrier Valley's alleged surface bargaining, and so there was no reason to infer that any such trend would be reversed by a preliminary injunction directing the hospital to bargain in good faith. Nor was there evidence, aside from Nurse O'Bryan's speculation, that the hospitals were purposefully seeking to replace registered nurses with licensed practical nurses in an effort to deplete the Union's strength. *See Muffley*, 570 F.3d 538, 544–45 (noting "abundant evidence" of discriminatory hiring by an employer in order to prevent unionization and then affirming both the district court's grant of injunctive relief ordering the employer to hire union members and its *denial* of an injunction directing the employer to recognize and bargain with the union).

In short, we conclude that the district court did not clearly err in making its factual findings and that it appropriately evaluated the record in concluding that the Board had failed to show that irreparable harm was likely without a preliminary injunction.

## III

While the Board appropriately recognizes that § 10(j) authorizes preliminary injunctions for the purpose of preserving the Board's remedial power pending the outcome of its administrative proceedings, its arguments for injunctive relief fail to demonstrate that the Board's ability to redress the alleged unfair labor practices will be impaired or frustrated.

The NLRA "empower[s]" the Board "to prevent any person from engaging in any unfair labor practice . . . affecting commerce." 29 U.S.C. § 160(a). And, to that end, the Act authorizes the Board to receive charges of unfair labor practices and, in response, to

issue complaints against the alleged offending parties. *Id*. § 160(b). The Act authorizes the Board to receive evidence, to render opinions on such charges, and, if violations are found, to issue an order "requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter." *Id*. § 160(c).

In this case, the Union has filed charges with the Board that the hospitals have been and are engaging in unfair labor practices, and the agency process is now ongoing before the Board. Nothing that the Board has presented in this case shows that its ability to remedy the hospitals' alleged violations is at risk of being rendered ineffective. We thus conclude that the district court, after carefully reviewing the alleged need for interim relief, did not abuse its discretion in denying it. Accordingly, we affirm.

AFFIRMED

19

GREGORY, Chief Judge, dissenting:

In determining whether it is "just and proper" to grant or deny a § 10(j) injunction, district courts in this Circuit must apply the four *Winter* factors "in light of the underlying purpose of § 10(j): preserving the Board's remedial power pending the outcome of its administrative proceedings." *Muffley ex rel. N.L.R.B. v. Spartan Mining Co.*, 570 F.3d 534, 543 (4th Cir. 2009). In this case, the district court's analysis begins and ends with the second *Winter* factor: irreparable harm. Because the district court failed to heed our instruction in *Muffley* and analyze irreparable harm in the proper context—preserving the Board's remedial power—I respectfully dissent.

For § 10(j) injunctions, irreparable harm is inseparably linked to the Board's ability to effectively remedy an illegal labor practice. Congress made this point clear when it defined irreparable harm as the harm caused by illegal labor practices, which the Board may not be able to remedy:

> Experience under the National Labor Relations Act has demonstrated that by reason of lengthy hearing and litigation enforcing its order, the Board has not been able in some instances to correct unfair labor practices until after *substantial injury* has been done. . . . [I]t has sometimes been possible for persons violating the act to accomplish their unlawful objective before being placed under any legal restraint and thereby to make it *impossible or not feasible to restore or preserve the status quo pending litigation*.

S. Rep. No. 105, 80th Cong., 1st Sess. 27 (1947) (emphasis added). *See also Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1188 (5th Cir. 1975) ("[I]t had become evident that normal NLRB machinery involving issuance of an unfair labor practice complaint, a hearing before a trial examiner, de novo review by the Board, and an enforcing order by a Court of Appeals was so time-consuming that guilty parties could

20

violate the Act with impugnity [sic] during the years of pending litigation, thereby often rendering a final order ineffectual or futile.").  In other words, when the nature of an illegal labor practice limits the Board's remedial powers, irreparable harm is more likely.  *See Frankl v. HTH Corp.*, 650 F.3d 1334, 1362 (9th Cir. 2011) ("[I]rreparable injury is established if a likely unfair labor practice is shown along with a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief.  In making the latter determination, inferences from the nature of the particular unfair labor practice at issue remain available.").  And when irreparable harm is more likely, injunctive relief becomes increasingly necessary to preserve the Board's power and prevent those who commit illegal labor practices from reaping the benefits of wrongful conduct.  *See id.*  ("In the context of the NLRA, permitting an alleged unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority is irreparable harm." (quotation marks, citations, and alterations omitted)).  Understanding this context—the nature of the Board's remedial powers (including its limitations)—is critical to how district courts must apply all the *Winter* factors, including irreparable harm.  Indeed, we said so in *Muffley*.  570 F.3d at 543.  *See also N. L. R. B. v. Aerovox Corp. of Myrtle Beach, S. C.*, 389 F.2d 475, 477 (4th Cir. 1967) ("Preservation and restoration of the status quo are then appropriate considerations in granting temporary relief pending determination of the issues by the Board." (quoting *Angle v. Sacks*, 382 F.2d 655, 660 (10th Cir. 1967)).

There are at least two situations in which the effectiveness of the Board's remedial powers is particularly limited, thus irreparable harm is more likely.  First, it is well-

21

established that the Board's remedial powers cannot overcome the passage of significant time. "As time passes, the benefits of unionization are lost and the spark to organize is extinguished. The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable." *N.L.R.B. v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996). Indeed, Congress explicitly noted as much in justifying the need for § 10(j) injunctions. *See* S. Rep. No. 105, 80th Cong., 1st Sess. 27 (1947) ("Time is usually of the essence [in labor disputes] . . . [h]ence we have provided that the Board, acting in the public interest and not in vindication of purely private rights, may seek injunctive relief in the case of all types of unfair labor practices[.]"). Second, a new union, one that has not successfully negotiated its first contract, is especially vulnerable to illegal labor practices. *See Ahearn v. Jackson Hosp. Corp.*, 351 F.3d 226, 239 (6th Cir. 2003) (concluding that a union that was "quite new and had not even signed its first contract" was "highly susceptible to management misconduct"). Because illegal negotiating tactics are more likely to stifle a nascent union, the Board's remedial powers are at greater risk during this critical period. *See, e.g.*, *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. N. L. R. B.*, 449 F.2d 1046, 1052 (D.C. Cir. 1971) ("In cases arising in district courts under § 10(j), decisions take account of the erosion of union strength that may result from an unjustified refusal to bargain.").

In this case, an infant union is attempting to negotiate its very first contract, and the Board's allegations of illegal bargaining span almost a year—both situations in which the Board's administrative remedies are limited and irreparable harm is more likely. However, the district court failed to consider irreparable harm in this context. First, the

22

district court emphasized the breadth of the Board's remedial powers, but ignored Congress's specific conclusion that, notwithstanding those remedial powers, certain labor injuries are beyond the Board's ability to redress—and therefore require prospective relief under § 10(j). The district court characterized the Board's powers as "broad" and "expansive" and concluded that the NLRB will be able to adequately remedy a year's-worth of alleged bad faith bargaining. J.A. 574. But its analysis failed to acknowledge that "[t]he Board cannot fashion a retroactive remedy for the harm to industrial peace that occurs during the period that the employer refuses to bargain." *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1192 (9th Cir. 2011); *see also Frankl*, 650 F.3d at 1363 ("And the Board generally does not order retroactive relief, such as back pay or damages, to rank-and-file employees for the loss of economic benefits that might have been obtained had the employer bargained in good faith."); *Electro-Voice, Inc.*, 83 F.3d at 1573 ("The district court's conclusion turns a blind eye to the effect of the passage of time. As this case demonstrates, years may pass before the Board reaches the merits of a case. As time passes the likelihood of union formation diminishes, and the likelihood that the employees will be irreparably deprived of union representation increases."). "Indeed, the longer that the Union is kept out . . ., the less likely it is to be able to organize and represent those employees effectively if and when the Board orders the [employer] to commence bargaining." *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 299 (7th Cir. 2001); *see also Frankl*, 650 F.3d at 1363 ("[E]ven if the Board subsequently orders a bargaining remedy, the union is likely weakened in the interim, and it will be difficult to recreate the original status quo with the same relative position of the bargaining

23

parties."). Second, rather than acknowledge this Union's inherent vulnerability to unfair labor practices, the district court presumed it to be resilient. The district court assumed that the Union's "assertive posture" will somehow shield it from irreparable harm caused by the alleged illegal bargaining. J.A. 568 The district court's assumption is unfounded and has long been forbidden by the Supreme Court. *See Int'l Ass'n of Machinists, Tool & Die Makers Lodge No. 35, v. Nat'l Labor Relations Bd.*, 311 U.S. 72, 82 (1940) ("It cannot be assumed that an unremedied refusal of an employer to bargain collectively with an appropriate labor organization has no effect on the development of collective bargaining. Nor is the conclusion unjustified that unless the effect of the unfair labor practices is completely dissipated, the employees might still be subject to improper restraints and not have the complete freedom of choice which the Act contemplates." (citations omitted)). Third, the district court disregards Congress's instruction and decades of judicial experience when it held that the harm in the alleged bad-faith bargaining is "purely speculative." J.A. 568. The opposite is true. "[F]ailure to bargain in good faith[] has long been understood as likely causing an irreparable injury to union representation." *Frankl*, 650 F.3d at 1362 (9th Cir. 2011). At bottom, the district court fundamentally missed the point of a § 10(j) injunction because it ignored the kinds of violations the Board *cannot* remedy; therefore its irreparable-harm analysis is detached from the context in which unfair labor injunctions must be assessed.

The majority insulates the district court's errors and holds that there is a "fundamental tension" between recognizing the harm inherent in certain unfair labor practices "and the Supreme Court's recognition that '[a] preliminary injunction is an

24

extraordinary remedy *never awarded as of right*.'" Majority op. at 13 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). But the tension is illusory. The majority seems to suggest that acknowledging the circumstances in which irreparable harm is more likely will compel district courts to grant § 10(j) injunctions whenever the Board demonstrates a likelihood of success on the merits of an unfair bargaining claim. But the majority's holding, similar to the district court's analysis, forgets that courts must balance the *four* equitable factors. To that end, "a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits. Rather, a court must also consider whether the movant has shown that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018) (citations omitted). Even if a court finds that the Board will likely succeed on the merits and that the nature of the alleged illegal labor practice increases the likelihood of irreparable harm, the other two factors—the balance of equities and the public interest—can "tilt[] against [its] request for a preliminary injunction." *Id.* at 1944; *see also Winter*, 555 U.S. at 23 (holding that public interest outweighed plaintiffs' likelihood of success on the merits and irreparable harm). Therefore, the majority's concern that recognizing inherent harm in certain illegal labor practices will somehow make § 10(j) injunctions commonplace is overblown and inconsistent with the precedent on which it relies.

At the center of this labor dispute are hardworking nurses, who have assembled in the form of a union in order to redress grievances. The NLRA and the NLRB protect

25

their right to bargain for fair and humane work conditions. Congress recognized that the NLRB's lengthy administrative process sometimes insulates illegal labor practices because once workers' collective voices are extinguished by illegal labor practices, the NLRB cannot reverse time. Accordingly, Congress enacted § 10(j) to prevent illegal practices from reaching fruition and district courts must grant or deny a § 10(j) injunction in light of Congress's purpose. The district court subverted the underlying purpose of § 10(j) by failing to analyze irreparable harm in the proper context and allowing likely illegal employer conduct to go unaddressed. And the majority effectively pushes injunctive relief out of reach for the types of illegal labor practices Congress specifically enacted § 10(j) to remedy.

I respectfully dissent.